**BURRELL et al. v. MICHAUX et al.**

(No. 8659.)

(Court of Civil Appeals of Texas. Galveston. April 17, 1925.)

**1. Appeal and error** ⬤⟾219(2)—**Findings not excepted to taken as⟍ reflecting established facts.**

Findings *not excepted to are taken as re-*flecting established facts.

**2. Associations** ⬤⟾4—**Right to enjoin use of ,laws, nomenclature, and emblems of order held not to depend on showing of tendency to mislead public.**

Fraternal order, though not incorporated, or engaged in business for profit, may enjoin con-

tinued use of its constitution, laws, nomenclature, and emblems by another order, and such right is not dependent on showing of specified injury, nor misleading of any particular person; it being sufficient if there was a natural and probable tendency to mislead and ·confuse the public to the hurt and injury of plaintiff orders.

**3. Trade-marks and trade-names and unfair competition** ⬤⟾3(1)—**Generic names and emblems protected by injunction, if unauthorized use thereof by defendants would mislead public.**

Generic names and emblems will be protected by injunction against unauthorized use thereof, if there has been such a prior combination and association of them with, or application of them to, a new and distinctive enterprise, that their subsequent use by others would mislead the public and injure association first using them.

**4. Limitation of actions** ⬤⟾39(1)—**Four-year limitation held inapplicable to suit to enjoin unauthorized use of laws and emblems of association.**

Where suit to enjoin defendants' unauthorized use of constitution, laws, nomenclature, and emblems of plaintiffs' orders was forwardlooking one and for. injunction only, plea of four-year limitation has no application.

**5. Associations** ⬤⟾4—**Evidence held to support findings that unauthorized use by defendants of laws, nomenclature, and emblems of order would constitute continuing injury and irreparable damage to plaintiffs. .**

In suit to enjoin unauthorized use by defendants of constitution, laws, nomenclature, and emblems of plaintiffs' fraternal order, evidence *held,* to support findings that continued use thereof would constitute continuing injury and irreparable damage to plaintiffs.

**6. Constitutional law.** ⬤⟾206(6)—**No .question of race nor discrimination on account of color presented.**

In suit to enjoin defendants' unauthorized use of constitution, laws, nomenclature, and emblems of plaintiffs' fraternal order, where both plaintiffs as a white order and defendants as ·a colored order drew membership from Masonic bodies of their own color, no question of race nor discrimination on 'account of color, within Const. U. S. Amend. 14, was presented.

**7. Associations** ⬤⟾4—**Plaintiffs held not guilty . of laches in enjoining unauthorized use of laws, nomenclature, and emblems of its orders. ·**

Fraternal order seeking to enjoin unauthorized use of its constitution, laws, nomenclature, and emblems ·*held,* not guilty of laches.

**8. Associations** ⬤⟾4—**Facts held to show no estoppel, abandonment, nor anything rendering it inequitable to arrest further invasion of plaintiffs' rights.**

Injunctive relief against unauthorized use by defendants of constitution, laws, nomenclature, and emblems of fraternal order *held* not barred by estoppel, abandonment, nor anything

⬤⟾For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

·rendering .it inequitable to arrest further invasion of plaintiffs' rights.

**9. Constitutional law ⚖══206(6)—Privileges and immunities within federal Constitution not abridged by enjoining imitation of fraternal order's names and emblems.**

Neither color nor citizenship conferred on colored persons privilege of imitating distinctive names and emblems of fraternal order of white members and their privileges and immunities within Const. U. S. Amend. 14, are not abridged by enjoining such imitation.

**10. Constitutional law ⚖══312 — Defendants, having had day in court, were not denied due process.**

Defendants, having been given day in court according to established custom and law, before granting of injunction restraining imitation of fraternal order's name, emblems, etc., were not denied due process.

**11. Corporations ⚖══49(2) — Defendants not given immunity against injunction by incorporating under acts of Congress.**

In view of Act Cong. May 31, 1870, immunity from injunction against unauthorized use of laws, name, and emblems of plaintiffs' order was not given defendants by reason of incorporation under Act Cong. May 5, 1870.

**12. Appeal and error ⚖══1050(1)—Admission of testimony merely cumulative held harmless.**

Where testimony objected to was cumulative of that admitted without objection, its admission was harmless.

**13. Evidence ⚖══473 — Testimony reflecting witnesses' opinion on effect of continued existence of defendant order properly received.**

In suit to enjoin defendants' unauthorized use of laws, name, and emblems of plaintiffs' orders, testimony reflecting what witnesses, familiar with conditions, had observed as to relations between plaintiff and defendant organizations, and effect of continued existence in same territory and opinion as to such effect, was properly received.

Appeal from District Court, Harris County; J. D. Harvey, Judge.

Suit by D. W. Michaux and others against A. H. Burrell and others. Judgment for plaintiffs, and defendants appeal. Affirmed.

Wilford H. Smith and W. M. C. Dickson, both of Houston, and Denison, Watkins & White, of Chicago, Ill., for appellants.

Pollard, Berry & Fisher, John H. Crooker, and Geo. C. Gaines, Jr., all of Houston, for appellees.

GRAVES, J. With the interpolation of only a few words tending to greater distinctness, this general statement of the nature and result of the suit is adopted from the appellees' brief as being substantially correct:

"On the 14th day of December, 1918, certain ones of the appellees, as officers of 'Arabia Temple' of the 'Ancient Arabic Order of Nobles of the Mystic Shrine for North America,' filed in the district court of Harris county their original petition complaining of some of the appellants as officers and members of 'Doric Temple' of the 'Ancient Egyptian Arabic Order Nobles of the Mystic Shrine of North and South America and Its Jurisdictions,' a local organization in Houston, Harris county, Tex. (the plaintiffs being the 'White Shrine' and the defendants the 'Negro Shrine'), alleging that said local organization was a colorable imitation of the local organization of appellees' known as 'Arabic Temple' of the 'Ancient Arabic Order of the Nobles of the Mystic Shrine for North America,' and alleging particularly and, in detail the various methods and means adopted by such appellants in appropriating the name, titles of officers, by-laws, regalia, paraphernalia, emblems, pins and passwords of the appellees, and alleging appellees' priority of right, praying for an injunction against such appellants. The contest as originally instituted was thus between the local organizations of Houston, Harris county, Tex. Thereafter on the 17th day of April, 1919, the 'Ancient Egyptian Arabic Order Nobles of the Mystic Shrine of North and South America and Its Jurisdictions,' the national organization of said order, of which the local defendant organization in Houston, Harris county, was a part, voluntarily intervened in said suit defending against the allegations of said original petition. Thereafter on the 18th day of December, 1922, the 'Imperial Council of the Ancient Arabic Order of Nobles of the Mystic Shrine for North America,' the national governing body of said order in America, of which the local organization of appellees in Harris county, Tex., is a part, voluntarily intervened in said suit, complaining against the original defendants, and also against the national order of appellants, setting up priority of right, the appropriation of name, titles of officers, paraphernalia, etc., and praying for an injunction.

"On the 25th day of March, 1922, the judge of the district court of Harris county, Tex., upon the allegations of the first amended original petition of the 'Arabia Temple,' issued a temporary injunction against 'Doric Temple' and its officers and members, restraining them from using the name, paraphernalia, constitution, by-laws, title of officers, etc., or any colorable imitation thereof, of 'Arabia Temple'; and on the 18th day of December, 1922, upon the allegations of the plea in intervention of 'Imperial Council of the Ancient Arabic Order of Nobles of the Mystic Shrine for North America,' the court issued a temporary injunction against the 'Ancient Egyptian Arabic Order of the Nobles of the Mystic Shrine of North and South America and Its Jurisdictions,' restraining it from the use of such names, titles of officers, etc.

"The original intervention of the national governing body of the appellees was filed as a corporation, and thereafter on the 18th day of February, 1924, the officers of said Imperial Council as such and as individuals in behalf of said national order, and the individuals in their own behalf and in behalf of all members of said national order, and local 'temples,' filed their plea in intervention, adopting all of the·

allegations in the petition of intervention filed by said Imperial Council as a corporation.

"The contest, therefore, being originally one between 'Arabia Temple,' the local organization of Houston, Tex., composed of white persons, a part of the national organization, and 'Doric Temple,' a local organization of Houston, Tex., composed of negroes, a part of the national organization, by reason of the voluntary intervention of the national organization of negroes, followed by voluntary intervention of the national organization of white persons, was broadened, and became one between the national organizations as well as the local organizations. The court at the conclusion of the testimony on final trial (a jury being waived), incorporating his conclusions of fact into the decree, entered his judgment perpetually restraining 'Doric Temple,' the local organization of Houston, Tex., and the 'Ancient Egyptian Arabic Order Nobles of the Mystic Shrine of North and South America and Its Jurisdictions,' the national organization, and its officers and members and successors in office, and its local temples and their officers and members throughout North America, from using the names, insignia, and emblems, paraphernalia, badges, jewels, constitution and by-laws, etc., of the appellees, or colorable imitations thereof, and from organizing or undertaking to organize any subordinate body in colorable imitation thereof, etc."

In protest against that judgment, the parties so acting below in representation of both such local and national "Negro Shrine" organizations, and their officers and members, appeal to this court.

At the request of appellants, the trial court filed very full findings of fact and law. Those of fact materially embodying the history and present status in relation to each other of the two litigating bodies are these: Paragraphs V, VI, IX, X, XI, XII, XIII, XIV, and XVIII, as to the whites, as follows:

"V. On the 26th day of September, A. D. 1872, in the city of New York, and state of New York, Walter M. Fleming, and others, organized a voluntary, fraternal order, which they named 'Ancient Arabic Order of the Nobles of the Mystic Shrine,' which name was afterwards changed to 'Ancient Arabic Order, Nobles of the Mystic Shrine for North America,' under which last name it is now in existence and has been for many years; that the order has since the 26th day of September, 1872, been the same in all respects except the change of name as here indicated; that said order was organized by Masons of the Ancient and Accepted Scottish Rite of the Thirty-Second Degree or higher, or of Masons who were Knights Templar; that the subordinate bodies of said order were designated as temples, the first organized of which was Gotham Temple, the name of which has since been changed to Mecca Temple, which now exists as such temple and has since its origin so existed, located in the city of New York, and state of New York; thereafter in 1873 the members of said order, with the permission of the original organizers, created Gennessee Temple No. 2, which said last temple

has been continuously in existence and is now in existence under the name of Damascus Temple; that said order has continuously existed and been in active and progressive operation since the 26th day of September, 1872, since which time it has organized throughout North America and within the islands under its jurisdiction 156 temples, each and all of which are under its jurisdiction and have a membership of approximately 600,000; that said order, and each and all of its subordinate temples, have been continuously active and in existence throughout North America and the islands under its jurisdiction since the 26th day of September, 1872, being actively engaged in fraternal and charitable work and the accumulation of property for such purposes during all of said time, amounting to the sum of hundreds of thousands of dollars.

"VI. That the supreme governing body of said order was organized on the 26th day of June, 1876, and known as the 'Grand Council' of said order, which said name was within a short time thereafter changed to 'Imperial Council of the Ancient Arabic Order of the Nobles of the Mystic Shrine for North America,' and under said original name and the change thereof has continuously existed and been in active operation since the 6th day of June, 1876, and is the supreme governing body of said 'Ancient Arabic Order of Nobles of the Mystic Shrine for North America,' and is the plaintiff-intervener herein; that there have been organized with its permission and under its jurisdiction said 156 temples, aforesaid, located throughout the continent of North America and the islands under its jurisdiction, all holding in subordination to it; that said order and said governing body continuously existed as a voluntary, fraternal order or association until the 30th day of March, 1894, at which time it was incorporated by a special act of the state of New York under the name of 'Imperial Council of the Ancient Arabic Order of the Nobles of the Mystic Shrine for North America,' and while an issue has been raised as to its incorporation, being now in existence, as the officers of said Imperial Council have intervened herein as such and as members of said order, and as this suit is brought both in its name as a corporation and in the names of its officers and individuals of said order as a voluntary, fraternal society or association, the question of incorporation is immaterial."

"IX. That at the organization of said order and of the Imperial Council thereof, the prerequisite for membership therein was fixed to be that of a Masonic Knight Templar, or of a Thirty-Second Degree of Ancient and Accepted Scottish Rite Mason, and said prerequisites for membership have been consistently adhered to by said order and by its Imperial Council, and by each and all of its subordinate temples.

"X. That at the organization of said order it adopted a certain constitution and laws, and adopted as its emblem the crescent of silver, gold, or coral, with a band of gold and a ring at its base and center, hung arch downward, the gold band to be decorated with a Sphinx head on one side, a pyramid with the urn on the other, the original jewel or emblem being formed of two nails from a tiger's paw, united at their bases with a gold band, which said constitution and laws and said emblems, etc., were

adopted. for said Imperial Council immediately after its formation as the constitution, laws, and emblems of said order, together with the following emblems and jewels, to wit: Crescent, pyramid, Sphinx head, panther-bodies, female Sphinx, the urn, sun, moon and stars. The red Turkish Fez was adopted as the universal style of head covering for the members of the order, the crescent when worn as a pin or jewel is frequently combined with a scimitar between its points, which is worn generally by the members of said order; the constitution and laws with immaterial amendments, and the said jewels and emblems, and head covering, have been strictly adhered to by said order and by said Imperial Council and by the temples and the members thereof since the organization thereof, and said order was the first order or organization or corporation in North America or elsewhere to adopt and use said constitution, laws, emblems, and jewels; that said order at its organization, and the Imperial Council, immediately after its formation, adopted for said order certain distinctive insignia and paraphernalia, and said order and said Imperial Council, the temples, and members thereof, strictly adhered to same since the original organization of said order; and said order was the first in North America or elsewhere to adopt and use said distinctive insignia and paraphernalia, etc.

"XI. That said insignia, paraphernalia, jewels, and emblems, and head covering, constitution, and laws, have always been distinctive of said 'Ancient Arabic Order of Nobles of the Mystic Shrine for North America.'

"XII. That said order, at its organization and said Imperial Council, immediately after its organization, adopted certain titles of officers of said Imperial Council and of its subordinate temples, as follows: For its Imperial Council, Imperial Potentate, Imperial Deputy Potentate, Imperial Chief Rabban, Imperial Assistant Chief Rabban, Imperial High Priest and Prophet, Imperial Treasurer, Imperial Recorder, Imperial Oriental Guide, Imperial First Ceremonial Master, Imperial Second Ceremonial Master, Imperial Marshal, Imperial Captain of the Guards, and Imperial Outer Guard; and for its subordinate temples, the following, viz., illustrious potentate, chief rabban, high priest and prophet, oriental guide, treasurer, recorder, first ceremonial master, second ceremonial master, director, marshal, captain of the guard, and outer guard. That the distinctive name in popular parlance of said order has since its organization and continuously since been 'The Shrine,' and the distinctive name of the members of said order has continuously since its organization been popularly known as 'Shriners or Nobles.'

"XIII. That said order, 'Ancient Arabic Order, Nobles of the Mystic Shrine for North America,' and its predecessor in name, through continuous activities since the original organization thereof on September 26, 1872, was the first order, either corporate or otherwise, to adopt and use said name and the distinctive words therein as the name of a fraternal order throughout North America and the islands under the jurisdiction of the Imperial Council of said order, and the first in time to adopt and use the distinctive constitution and laws and the distinctive emblems, insignia, regalia, para-

phernalia, badges, head coverings, etc., and the first in time to adopt and use the distinctive names of officers of its Imperial Council, and of its subordinate temples, and the first in time to adopt and use the distinctive name of 'temple' for its subordinate organization, and the first in time to adopt and use the popular name of 'Shrine' for its subordinate organizations, and the first in time to adopt and use the popular name of 'Shriners' and 'Nobles' for its members in North America and the islands under the jurisdiction of its Imperial Council, and have continuously since the original organization thereof adopted and used such distinctive constitution and laws, emblems, insignia, paraphernalia, regalia, jewels, badges, names of officers, names of subordinate temples, and names of members throughout North America and the islands under the jurisdiction of its Imperial Council; that no such order ever existed in Egypt, Arabia, or in any other European country.

"XIV. The continued existence of said order and of its Imperial Council and of its subordinate temples, and the continued integrity of its membership, depend entirely upon the good will and esteem in which they are held by the general public, as well as by the Masonic bodies from which the membership is drawn, and they, depend for support upon initiation fees and dues paid by members, and any use of said constitution and laws, or distinctive names, or distinctive emblems, insignia, regalia, paraphernalia, jewels, badges, head covering, names of officers, titles of officers, names of subordinate temples, and names of members by any other fraternal organization, corporate or otherwise, is a continuing wrong and injury to said order and the membership thereof, and will cause irreparable damage and detriment to said order, both in popular esteem, and in the continued existence thereof and in the growth thereof, and in the fraternal and charitable work in which it is engaged, as well as irreparable damage to its properties, for relief against which no adequate remedy at law exists."

"XVIII. That the continued use by the defendants and the defendant-intervener, and its subordinate temples and members, of the constitution and laws, titles of officers, insignia, emblems, badges, pins, paraphernalia, head covering, names of subordinate organizations, and names of members of the plaintiffs, and plaintiff-intervener, and other plaintiff-interveners herein, are colorable imitations thereof, constitute and would continuously constitute a fraud and a fraudulent deception, unfair practice, and harmful injury to the plaintiff, the plaintiff-intervener, the other plaintiff-interveners, and the entire membership of their order, to their irreparable damage."

Paragraphs XV and XVI, as to the negroes, as follows:

"XV. On the 1st day of June, 1893, one Rofelt Pasha, purporting to be of Mecca, Arabia, initiated at Chicago, Ill., into an order which he designated as the 'Order of Mystic Shrine,' certain colored Masons, and designated said order as 'Imperial Grand Council of the Ancient Arabic Order, Nobles of the Mystic Shrine of Free Masonry of North and South

America'; that said Rofelt Pasha, and his successors, including the defendants, and the defendant-intervener herein, appropriated unto themselves the constitution and laws, the insignia, paraphernalia, emblems, jewels, pins, head covering, titles of officers, names of subordinate organizations, and popular names of subordinate organizations, and names of members, which had theretofore been used and adopted and had become distinctive of the plaintiffs and plaintiff-intervener, and the other plaintiff-interveners herein, for more than 20 years, and thereafter several subordinate temples of said order withdrew from said organization, and in December, 1900, organized at Philadelphia, Pa., the defendant-intervener, under the name of the 'Ancient Egyptian Arabic Order, Nobles of the Mystic Shrine for North and South America and Its Jurisdictions,' which last-named order was incorporated under the Revised Statutes of the United States, and has continuously existed, and has continuously since said original organization and since such incorporation to appropriate the constitution and laws, titles of officers, insignia, regalia, paraphernalia, jewels, emblems, pins, names of subordinate organizations, names of members, and popular names of subordinate organizations and members of the plaintiffs, and of the plaintiff-intervener, and of other plaintiff-interveners herein; that said organization is a colorable imitation of the order of plaintiff, of plaintiff-intervener, and of the other plaintiff-interveners herein, and the names of its officers, of its Imperial Council, and of its subordinate temples, and the distinctive name of its subordinate organizations as temples, and its emblems, jewels, pins, head covering, regalia, paraphernalia, constitution and laws, and the popular names of its subordinate organizations, and of its members, are but colorable imitations of such plaintiff, and of plaintiff-intervener, and all other plaintiff-interveners herein, all of which having been appropriated by said defendant, and said defendant-intervener, without the knowledge, consent, or acquiescence of plaintiffs, or plaintiff-intervener, or other plaintiff-interveners herein; that said defendant and said defendant-intervener and its subordinate organizations have continuously since its organization, and continue now to appropriate said titles of officers, said emblems, jewels, pins, paraphernalia, regalia, head covering, names of subordinate organizations, and names of members to the continuing injury and damage of plaintiff, plaintiffs, plaintiff-intervener, and other plaintiff-interveners herein, for relief against which there is no adequate remedy at law.

"XVI. That notwithstanding the existence of defendant and defendant-intervener for more than 30 years, the entire membership of defendant-intervener throughout North America is approximately of not more than 9,000, and the property which it has accumulated comparatively small in value to that of plaintiff, plaintiffs, plaintiff-intervener, and that of other plaintiff-interveners herein."

Concluding paragraphs XIX to XXIV, inclusive, are to the effect that Rofelt Pasha was not from Arabia, had no authority to organize any order in the United States known as the "Mystic Shrine," nor did a temple of any such order ever exist in Arabia; that the national body of appellants is instituting its so-called temples throughout North America in colorable imitation of those of the appellees, and is appropriating to its own benefit their names, emblems, titles of officers, constitution, and laws, etc.; that the distinctive system of nomenclature appertaining to the appellees' order, as specified in foregoing findings, having been in continuous use by their order for over 50 years, has become individually characteristic of and peculiarly valuable to it, both in relation to property interests and to public standing, inclusive of that with non-Shriner Masons, as a consequence of which its appropriation by appellants would result in serious continuous damage to it in these relationships especially; that appellants are confederating together in continuing their infringement of appellees' rights; that Doric Temple was organized in Houston, Tex., August, 1917, this suit being filed practically at once after knowledge of that fact came to appellees, and that the existence of appellants' local temples at Dallas, El Paso, and other points in Texas, was not known to appellees until after they had so filed this action.

The conclusions of law were in substance that appellees were entitled to the injunction sought, and that their right to it had not been defeated by laches, delay, or acquiescence.

Appellants, under their propositions I, III, VII, VIII, and IX, attack as not being supported by the evidence only so much of those fact findings as determined: (1) That appellees had not known until after the filing of this suit of the existence of appellants' subordinate temples at Dallas, El Paso, and other points in Texas; (2) that they had neither acquiesced in the right of appellants to so exist, propagate, and colorably imitate, nor been guilty of laches in not sooner instituting court proceedings against them; (3) that any use by another fraternal organization of the constitution and laws, nomenclature, emblems, etc., of the appellees would constitute a continuing injury and irreparable damage to them both in their property and standing with the public generally, inclusive peculiarly of non-Shriner Masons; (4) that appellants' order as now existing is a colorable imitation of appellees'; that they are attempting to further so propagate it throughout North America, as well as to appropriate the laws, titles, names, emblems, etc., of the appellees, all of which does at this time and continuously will constitute a fraudulent deception, unfair practice, and harmful injury toward appellees; (5) that the appellees' order was the first to adopt and use throughout North America its distinctive name, constitution, nomenclature, emblems, etc., and that no such order ever existed in Egypt, Arabia, or in any other European country, as detailed in the above-quoted paragraph XIII.

[1] Under the rule obtaining in our courts,

all other stated findings below are to be taken as reflecting established facts.

As concerns the conclusions of law, appellants contend that they are not only based upon unjustified premises in the respects just specified, but are also otherwise unsound. They further urge that there was prejudicial error against them in the overruling of their special pleas of four years' limitation and of laches, in admitting certain testimony over their objection, and, finally, that the adverse judgment denied them the equal protection of the law within the meaning of the Fourteenth Amendment to the Constitution of the United States, disregarded section 1, art. 4, of that document in not giving full faith and credit to the decision of the Supreme Court of the United States in the case of Creswill v. Knights of Pythias, reported in 225 U. S. 246, 32 S. Ct. 822, 56 L. Ed. 1074, and violated their rights in ignoring the Acts of Congress of May 5, 1870 (16 Stat. 98), and amendments thereof, relating to the creation of corporations in the District of Columbia, as well as those of April 9, 1866 (14 Stat. 27) and May 31, 1870 (16 Stat. 140), providing that all citizens of the United States shall have the same rights and privileges as white citizens thereof.

Nowhere do appellants claim either that the names, constitution and laws, titles, paraphernalia, emblems, etc.—that is, everything the appellees alleged to be distinctive in them —were not the same as those of appellees or that they had not been and were not proposing to continue using them in precisely the same manner (nor could they well do so in view of the undisputed evidence that such was the case), but they confess this situation to be literally true, and then seek avoidance of its effect and of the charge of their opponents that they have purloined the livery of the whites to serve the colored in by a plea that they sprang full-grown from a pre-existing if not prehistoric order of essentially the same designation and characteristics, instituted among the dark races of Arabia by a son-in-law of the Prophet Mohammed, at Mecca, as far back as 656, A. D.; in other words, the appropriation or imitation of anything belonging individually to or being distinctive in their opposing litigants is what they deny, their position being that their admitted use of these identical things, instead of constituting an infringement or being wrongful, is merely the exercise of a right common alike to them and the appellees; and they add that the latter have acquiesced in the exercise of that right on their part, and, by reason of not sooner complaining, are now estopped to say otherwise.

This attitude narrows considerably the task before us of determining whether or not they have shown to be unsupported by the evidence any of the trial court's fact findings touching the matters they thus do contest. After a most careful consideration of the statement of facts, we are unable to say that they have, concluding rather that the court's stated findings, in all material respects, are sufficiently supported by the evidence before it.

There was testimony from high sources, given as under personal knowledge, that of United States Minister Caldwell and of American Consul General Baden, at Cairo, Egypt, furnishing sufficient basis for the findings that no such order of "Mystic Shrine" ever existed in Egypt, Persia, or Arabia, and that Rofelt Pasha—on whose establishment of it at Chicago, Ill., in 1893, appellants are dependent for their claim of Arabian origin of their order and of independent right to their ritual and nomenclature—had no authority from any such organization. At the same time, however, this court does not regard these findings as at all necessary to support the judgment rendered, for the reason that it stands uncontroverted in this record that the appellees first adopted and used the names and emblems here involved in the United States and the city of Houston, Tex., where this litigation arose; in fact, occupied the field in this country exclusively for more than 20 years before appellants started their practices.

While this is true, the evidence also established, and there should be added findings to the effect, that in 1894 appellees' Imperial Potentate reported to about 100 members present at their annual meeting at Denver, Colo., that there existed in the states of Illinois, Ohio, Missouri, and Texas, organizations of colored people "who have pirated our title almost verbatim," recommending incorporation as a preventive measure; that the act of incorporation of appellees' order in New York of March 30, 1894, stated in the paragraph VI hereinbefore quoted from the trial court's fact findings, was not accepted by their Imperial Council which voted in 1895 that incorporation was neither necessary nor desirable; and that the first temple of appellants was established in Texas at Dallas, in February, 1894, there being only about 600 of their members thinly scattered throughout the state as a whole at the time of this trial below.

Upon the basis of fact thus found below and here to have existed, this court is unable to hold the issuance of the writ complained of wrongful; even a casual examination of the record before us, much of it photographic in character, discloses an apparently careful avoidance anywhere of the use of African, colored, negro, or other prefix, suffix, sign, or symbol, that would even tend to indicate that the votaries of appellants' order were of that race; moreover, their word for word use of the very same things as those of the appellees, down to the minutest details, without variation or shadow of turning, and with no indicia of any individual ingenuity or orig-

inality whatever, coming from a race of people whose instinct it is to imitate the white race around them, is itself telltale evidence tending toward the learned trial court's conclusion that the stories adduced of Arabian ancestry were only vague myths, and that their practices constituted merely a colorable imitation of the whites—res ipsa loquitur.

[2] That such imitation furnished a casus belli, a just ground for injunctive relief, to such a benevolent association as the appellees constituted, even though neither incorporated nor engaged in business for material profit, has, we think, been definitely determined by the courts of this country, which have come to apply to real life with us, especially in its fraternal, benevolent, and humanitarian activities, at least the idea inhering in the doctrine of Iago to Othello: "He who steals my purse steals trash, but he that filches from me my good name leaves me poor indeed." Rudolph v. Southern Beneficial League (Sup.) 7 N. Y. S. 135; Aiello v. Montecalfo, 21 R. I. 496, 44 A. 931; Society of War of 1812 v. Society of War 1812 in the State of New York, 46 App. Div. 568, 62 N. Y. S. 355; International Committee Y. W. C. A. Ass'n v. Y. W. C. A. of Chicago, 194 Ill. 194, 62 N. E. 551, 56 L. R. A. 888; Knights of Maccabees v. Searle, 75 Neb. 285, 106 N. W. 448; National Council Junior Order United American Mechanics et al. v. State Council Junior Order United American Mechanics, 104 Va. 197, 51 S. E. 166; State Council of Junior Order of United American Mechanics of New Jersey v. National Council of J. O. U. A. M. of North America, 71 N. J. Eq. 433, 64 A. 561; Legal Aid Society v. Co-operative Legal Aid Society, 41 Misc. Rep. 127, 83 N. Y. S. 926; People v. Rose, 225 Ill. 496, 80 N. E. 293; B. P. O. E. v. Improved B. P. O. E. of the World, 60 Misc. Rep. 223, 111 N. Y. S. 1067, affirmed in 133 App. Div. 929, 118 N. Y. S. 1094; B. P. O. E. v. Improved B. P. O. E. of the World, 205 N. Y. 459, 98 N. E. 756; L. R. A. 1915B, 1074, Ann. Cas. 1913E, 639; B. P. O. E. v. Improved B. P. O. E. of the World, 122 Tenn. 141, 118 S. W. 389; Salvation Army in the United States v. American Salvation Army, 135 App. Div. 268, 120 N. Y. S. 471; Daughters of Isabella v. National Order of Daughters of Isabella, 83 Conn. 679, 78 A. 333, Ann. Cas. 1912A, 822; Grand Lodge K. P. of North and South America v. Grand Lodge K. P., 174 Ala. 395, 56 So. 963; Creswill v. Grand Lodge K. P. of Ga., 133 Ga. 837, 67 S. E. 188, 134 Am. St. Rep. 231, 18 Ann. Cas. 453; Id., 225 U. S. 246, 32 S. Ct. 822, 56 L. Ed. 1074; Emory v. Grand United Order of Odd Fellows, 140 Ga. 423, 78 S. E. 922; Cape May Yacht Club v. Cape May Yacht & Country Club, 81 N. J. Eq. 454, 86 A. 972; Talbot v. Independent Order of Owls, 220 F. 660, 136 C. C. A. 268; Afro-American Order of Owls v. Talbot, 123 Md. 465, 91 A. 570; Faisan

v. Adair, 144 Ga. 797, 87 S. E. 1080, Ann. Cas. 1918A, 243; Id., 148 Ga. 403, 96 S. E. 871; certiorari denied by U. S. Supreme Court, 248 U. S. 583, 39 S. Ct. 136, 63 L. Ed. 432.

The right to injunction in such cases has furthermore been determined to be dependent neither upon the actual showing of specific injury nor the misleading of any particular person, the demands of the law in this respect being met when it is made to appear that there is a natural and probable tendency to mislead and confuse the public to the hurt and injury of the association having the prior right to the distinctive names and emblems. McLean v. Fleming, 96 U. S. 245, 24 L. Ed. 828; El Modello Cigar Mfg. Co. v. Gato, 25 Fla. 886, 7 So. 23, 6 L. R. A. 823, 23 Am. St. Rep. 537; Bissell Chilled Plow Works v. T. M. Bissell Plow Co. (C. C.) 121 F. 357; Atlas Assurance Co. v. Atlas Insurance Co., 138 Iowa, 228, 112 N. W. 232, 114 N. W. 609, 15 L. R. A. (N. S.) 625, 128 Am. St. Rep. 189; also all authorities cited supra.

[3] Even generic names and emblems will be so protected if there has been such a prior combination and association of them with, or application of them to, a new and distinctive enterprise that their subsequent use by others would thus tend to mislead the public and injure the association first so using them. The rule applicable is stated by Justice Holmes, now of the United States Supreme Court, while a member of the Supreme Court of Massachusetts, in Watch Co. v. Watch Co., 173 Mass. 85, 53 N. E. 141, 43 L. R. A. 826, 73 Am. St. Rep. 263, in this way:

"It is true that a man cannot appropriate a geographical name, but neither can he a color, or any part of the English language, or even a proper name to the exclusion of others whose names are like his. Yet a color in connection with a sufficiently complex combination of other things may be recognized as saying so circumstantially that the defendant's goods are the plaintiff's as to pass the injunction line. New England Awl & Needle Co. v. Marlborough Awl and Needle Co., 168 Mass. 154, 156. So, although the plaintiff has no copyright on the dictionary or any part of it, he can exclude a defendant from a part of the free field of the English language, even from the mere use of generic words unqualified and unexplained, when they would mislead the plaintiff's customers to another shop. Reddaway v. Banham, [1896] A. C. 199. So the name of a person may become so associated with his goods that one of the same name coming into the business later will not be allowed to use even his own name without distinguishing his wares. Brinsmead v. Brinsmead, 13 Times L. R. 3. * * * And so, we doubt not, may a geographical name acquire a similar association with a similar effect."

Other cases to the same effect are: Yellow Cab Co. v. Cook's Taxicab & Transfer Co., 142 Minn. 120, 171 N. W. 269; Garrett & Co. v. Sweet Valley Wine Co. (D. C.) 251 F. 371; Knights of Maccabees v. Searle, 75 Neb. 285,

106 N. W.·448; Salvation Army in the United States v. American Salvation Army, 135 App. Div. 268, 120 N. Y. S. 471; Talbot v. Independent Order of Owls, 220 F.· 660, 136 C. C. A. 268; Faison v. Adair, 144 Ga. 797, 87 S. E. 1080; Id., 148 Ga. 403, 96 S. E. 871; Id., 248 U. S. 583, 39 S. Ct. 136, 63 L. Ed. 432.

It has likewise been as unequivocally declared by our judicial tribunals that equity, regarding the wrong and injury inflicted by such an appropriation and imitation of things distinctive in another as a continuing one—especially where done intentionally and fraudulently—will interpose the remedy of injunction, although limitation or laches might bar the action were it merely one for damages for infringement. McLean v. Fleming, 96 U. S. 245, 24 L. Ed. 828, supra; Menendez v. Holt, 128 U. S. 514, 9 S. ·Ct. 143, 32 L. Ed. 526; Saxlehner v. Eisner & Mendelson Co., 179 U. S. 19, 21 S. Ct. 7, 45 L. Ed. 60; Jenkins Bros. v. Kelly & Jones Co. (D. C.) 212 F. 328; Id., 227 F. 211, 142 C. C. A. 11; Bissell Chilled Plow Works v. T. M. Bissell Plow Co. (C. C) 121 F. 357, supra; W. A. Gaines & Co. v. Whyte Grocery, Fruit & Wine Co., 107 Mo. App. 507, 81 S. W. ·648; Layton Pure Food Co. v. Church & Dwight Co., 182 F. 35, 104 C. C. A. 475; 32 L. R. A. (N. S.) 274; Bonnie & Co. v. Bonnie Bros., 160 Ky. 487, 169 S. W. 871; Wolfe v. Barnett & Lion, 24 La. Ann. 97, 13 Am. Rep. 111; Edward & John Burke v. Bishop (C. C.) 175 F. 168; Moline Plow Co. v. Omaha Iron Store Co., 235 F. 519, 149 C. C. A. 65; Fahrney & Sons Co. v. Ruminer, 153 F. 735, 82 C. C. A. 621; Sheffield-King Milling Co. v. Sheffield Mill & Elevator Co., 105 Minn. 315, 117 N. W. 447, 127 Am. St. Rep. 574; Oklahoma Producing & Refining Co. v. Oklahoma Consolidated Producing & Refining Co., 12 Del. Ch. 62, 106 A. 38; Thum v. Dickinson, 245 F. 609, 158 C. C. A. 37; Id., 246 U. S. 664, 38 S. Ct. 334, 62 L. Ed. 928; Wesson v. Galef (D. C.) 286 F. 621; 38 Cyc. 881.

[4, 5] Under these direct holdings, the statute of limitation as such, and the various cases applying it, cited and relied upon by appellants, have no application here, where the suit is a forward-looking one and for injunction only; not only so, but their further insistence that no pecuniary or property-right injury has been shown by appellees—merely, if anything, a fanciful or sentimental one affecting their alleged social standing only, hence not subject to relief by injunction—even were it supported by the facts, is equally abortive. In the first place, while under the authorities referred to that was not an indispensable requisite, there was substantial and material injury shown in this instance, as the trial court correctly found under the evidence. The criterion in this particular sort of action is not, as appellants evidently conceive, whether or not their masquerading in the borrowed plumage of the whites has a tendency to, or has in fact led the public to

273 S.W.—56

mistake one order for the other, but in part, at least, whether it has or will detract from the distinctive place of high standing attained by the appellees with the public, generally, and with their non-Shriner fellow Masons, to whom alone they must look for perpetuation and financial support, particularly. That this result had been and would continue to be the natural and probable consequence of the practices inveighed against in the bill for injunction was so abundantly shown that reference to the evidence by which it was established is deemed unnecessary.

Witness after witness testified, not merely as a matter of his opinion, but as a result of his actual experiences and observation—indeed, there was little if any controversion on the point—that the continued use by the negroes of the things that typified the high estate the white Shriners had reached would both injure them financially in deterring other Masons from becoming members and contributing materially to the organization, which was the sole source of its property interests, and would lower them in the esteem of these fellow Masons and of the public generally, thereby measurably restricting their growth and activities, if not furnishing a menace to their continued existence.

Obviously, in such circumstances, it is no answer to reply, as appellants do at much length, that there has since their organization been no decline in either aggregate membership or ·financial resources with appellees, since this result has been shown to have been accomplished in spite of the injurious effect of appellants' complained-of acts.

Neither is it necessary to confuse with the question litigated in this proceeding in equity the right to exist as Masons generally; there is no such issue here; the undisputed proof, in fact that for both sides, shows that no connection whatever exists between Masonry proper and the Shrine, the two being wholly separate and distinct organizations, the only relationship of either to the other being that the Shrine permits none other than a Mason who has attained the Knight Templar or Thirty-Second Scottish Rite Degree to become a member of it; so that, were it conceded that the negroes had the same right as the whites to pursue in this country the tenets of Masonry, their defensive standing before the court in this case would in no wise thereby be strengthened. For this reason much of the financial showing marshaled in the brief of appellants has no relevancy, since it relates to the property interests attributed to negro Masons generally and is not· confined to their so-called Shrine organizations. The trial court's finding that their property values are comparatively small in relation to those of appellees is therefore unaffected by it.

[6] It follows, too, that there is neither a race nor discrimination on account of color question presented, since the same state of

the evidence also established that neither the white nor colored Shrine draws its membership from the public direct but solely from their respective Masonic bodies, in which only persons of their own color are admissible, neither being eligible to membership in the other.

The adverse decree must rest upon the finding of colorable imitation and wrongful appropriation, to the injury of the appellees, and not upon the fact that the opposing litigants happen to be of different races. Had the controversy been between those of the same race, it would have issued in no different wise, as we construe the authorities.

[7] As concerns the earnestly urged defense of laches, this court perceives no reason for not holding the principles governing the infringement of trade marks and names in that regard applicable here. The rule there obtaining is thus stated by the Supreme Court of the United States in Menendez v. Holt, 128 U. S. 514, 9 S. Ct. 143, 32 L. Ed. 526, supra:

"Mere delay or acquiescence cannot defeat the remedy by injunction in support of the legal right, unless it has been continued so long and under such circumstances as to defeat the right itself. Hence, upon an application to stay waste, relief will not be refused on the ground that, as the defendant had been allowed to cut down half of the trees upon complainant's land, he had acquired, by that negligence, the right to cut down the remainder, Attorney General v. East Lake, 11 Hare, 205; nor will the issue of an injunction against the infringement of a trade-mark be denied on the ground that mere procrastination in seeking redress for depredations had deprived the true proprietor of his legal right, Fullwood v. Fullwood, 9 Ch. D. 176. Acquiescence to avail must be such as to create a new right in the defendant. Rodgers v. Nowill, 3 De G., M. & G. 614. Where consent by the owner to the use of his trade-mark by another is to be inferred from his knowledge and silence merely, 'it lasts no longer than the silence from which it springs; it is, in reality, no more than a revocable license.' Duer, J., Amoskeag Mfg. Co. v. Spear, 2 Sandford (N. Y.) 599."

See, also, Cyc. vol. 38, p. 881; McLean v. Fleming, 96 U. S. 245, 24 L. Ed. 828; Saxlehner v. Eisner et al., 179 U. S. 19, 21 S. Ct. 7, 45 L. Ed. 60; Layton, etc., Co. v. Church et al., 182 F. 35, 104 C. C. A. 475, 32 L. R. A. (N. S.) 274; Bonnie & Co. v. Bonnie Bros., 160 Ky. 487, 169 S. W. 871.

[8] Under the findings and the additional facts to which we have adverted, there is here no estoppel, abandonment, nor anything rendering it inequitable to arrest the further invasion of the complainants' rights; what the court further said in the case just quoted from is equally applicable to this:

"Delay in bringing suit there was, and such delay as to preclude recovery of damages for prior infringement, but there was neither conduct nor negligence which could be held to destroy the right to prevention of further injury."

The case most nearly paralleling this one in its controlling features, perhaps, is that before cited of Faisan v. Adair (144 Ga. 797, 87 S. E. 1080, Ann. Cas. 1918A, 243, and 148 Ga. 403, 96 S. E. 871), decided by the Supreme Court of Georgia, with writ of certiorari denied by the United States Supreme Court (248 U. S. 583, 39 S. Ct. 136, 63 L. Ed. 432). The parties were local temples in Georgia of the same national bodies as those here, the objective of the suit was the same, it having been brought by the local White Shrine to enjoin the like Negro Shrine from using, in colorable imitation, its distinctive names, etc. Upon a foundation of fact practically identical with what we have found to underlie this cause, the injunction sought was granted and sustained. The principles of law there applied, with the sanction of the highest court in the land, likewise rule the cause at bar, we think. In so determining, we are not unaware of the decision of the same tribunal in Creswill v. Grand Lodge, Knights of Pythias, 225 U. S. 246, 32 S. Ct. 822, 56 L. Ed. 1074, upon which appellants mainly rely.

But that case seems to us clearly distinguishable from this; the reversal was rested solely upon the finding that the plaintiff had been guilty of laches, and that the state courts had assumed the contrary in the face of the "undisputed evidence in any particular whatever" that it had been—the very antithesis of what we have found to be the condition in that respect of the record now before us.

In the next place, we do not understand this doctrine of laches to constitute a Procrustean bed upon which those who have been dilatory in stopping the encroachments of others must lie whatever the extent or nature of their remissness, but, like the remedial writ it sometimes bars, that it is a creature of equity, the application of which rests much in the sound discretion of the chancellor under the peculiar facts before him in the particular case at hand.

The application by the court of the doctrine of laches in that instance is based upon what it terms the "vast expansion" of the defendant order, under this finding of the facts about it, all of which the plaintiff order, under the preceding determination as to its guilty dallying, was held to have known:

"That the membership of the order throughout the United States aggregated 300,000; that there had been collected and disbursed by the members of the order between July 1, 1906, and July 1, 1907, more than $500,000; that the collections in Georgia during the existence of the order aggregated $180,232.21; that there had been paid to the widows and orphans of the deceased members in Georgia $148,680; and that the collections in Georgia aggregated $50,000 a year, excluding the expenses of burying their dead, which was $9,000 more."

Far different from that showing is what appears here, where the insurance feature so strongly present in the Creswill Case is absent. Appellants' order has no insurance provision, no fund for widows and orphans or burials, its property consisting only of clubrooms and paraphernalia of relatively insignificant value, and its total membership of 9,000 throughout North America distributes an average of only about 188 individuals to each state of the Union.

Upon the other hand, the White Shrine since its organization has instituted 156 local temples throughout the United States, in Mexico, and in the islands of the Pacific, and has a membership of 600,000 or more. Its real estate property values in the city of Houston alone are $150,000 or more, and throughout the United States run into the hundreds of thousands of dollars. The collections and expenditures yearly in the construction, equipment, and maintenance of hospitals for crippled children are more than a million dollars, and it has constructed and has under construction throughout the United States as many as 10 of these hospitals. It collected and expended during the war for war relief hundreds of thousands of dollars.

When these comparative facts and conditions are considered, no proper parallel, it seems to us, is presented between this and the Creswill Case for the application of the finding that alone determined the latter.

[9-11] What has already been said disposes of the claim for a violation against appellants of the provisions of the Fourteenth Amendment to the federal Constitution. For the reason there given, there is no issue raised as to any discrimination against them because of their color, nor does the record present one as to the abridgment of any privileges or immunities inuring to them as citizens of the United States. Neither their color nor such citizenship conferred upon them the special privilege of infringing upon the rights of the appellees by so intentionally and fraudulently imitating their distinctive names and emblems. They were also given their day in court according to established custom and the law of the land, wherefore there was no denial to them of due process. Moreover, and for the same reason, they were given no immunity bath against the visitation of the writ of injunction by reason of incorporation under the acts of Congress they invoke. These same complaints were made and adversely determined upon a like state of facts in the cases of Faisan v. Adair, supra, and B. P. O. E. v. Improved B. P. O. E., reported, respectively, in 60 Misc. Rep. 223, 111 N. Y. S. 1067, and 205 N. Y. 459, 98 N. E. 756, L. R. A. 1918B, 1074, Ann. Cas. 1913E, 639. In Creswill v. Grand Lodge, K. of P., supra, no reference appears to any question of race discrimination, and Justice Lurton dissented from the holding that any federal question was even raised by the incorporation under an act of Congress.

[12, 13] The admission of the testimony challenged, that of the witnesses Terrell and Adair, is not thought to involve error, for two reasons: First, it was merely cumulative of that of many other witnesses to the same effect, admitted without objection, and was therefore in any event harmless. McCormick v. Cleveland (Tex. Civ. App.) 146 S. W. 698; Dignowity v. Lindheim (Tex. Civ. App.) 109 S. W. 966; Ry. v. Brune (Tex. Civ. App.) 181 S. W. 547; Ry. v. Price, 48 Tex. Civ. App. 210, 106 S. W. 700. Second, it merely reflected what witnesses thoroughly familiar with conditions about which they were testifying had observed as to the relations between the two organizations here involved and the effect of their coexistence in the same territory in the circumstances before outlined, together with, in a certain sense, their conclusions or opinions upon what would be the natural and probable effect of a continuation of it, and was receivable. Bell v. Blackwell, 273 S. W. 866, decided by this court March 26, 1925, and authorities there cited.

From these conclusions it follows that the trial court's judgment should be affirmed; it has been so ordered.

Affirmed.