## BURRELL et al. v. MICHAUX et al.
### (No. 608–4442.)

(Commission of Appeals of Texas, Section B. June 23, 1926.)

**1. Appeal and error ⟐1094(2).**

Trial court's fact findings, supported by evidence and approved by Court of Civil Appeals, are conclusive.

**2. Equity ⟐65(1).**

Injunction being equitable proceeding, plaintiff must come into court with clean hands and do no injustice.

**3. Injunction ⟐113.**

Complainant's laches alone is no equitable reason for denying injunction against continuous wrong.

**4. Injunction ⟐113.**

Laches may be of such duration and under circumstances evidencing consent or acquiescence in things complained of, and thus preclude injunctive relief.

**5. Injunction ⟐113.**

No equity in defendant entitles him to continue wrong because plaintiff has not complained, question being whether injunction would be inequitable under all circumstances.

**6. Injunction ⟐113.**

Where delay is for such time as to show assent or acquiescence by plaintiff to continuance of the wrong, equity will not interfere.

**7. Injunction ⟐9—Parties' rights and hardships should be balanced in granting or refusing writ.**

In determining whether equities are with complainant or defendant, their respective rights and hardships should be balanced in granting or refusing injunction.

**8. Injunction ⟐14.**

Complainant irreparably injured by violation of plain right is ordinarily entitled to injunction, though injury is small as compared with that to defendant if writ issues.

**9. Associations ⟐4—Fraternal order's right to limit membership to white men will be protected by injunction against use of its emblems and insignia by negroes.**

Right of charitable or fraternal order to limit membership to white men will be protected by injunction against use of identical emblems and insignia by negroes for fraudulent purpose of appropriating benefits of order to themselves.

**10. Associations ⟐8.**

Segregation of white and black races, as by limiting membership of fraternal order to white men, may be lawfully enforced.

**11. Associations ⟐4—Fraternal order, with 600,000 members and property of great value, held not estopped by laches to enjoin use of emblems and insignia by younger order.**

Fraternal order in continuous operation since 1872, with about 600,000 members and

property of great value, *held* not estopped by laches to enjoin use of its emblems and insignia by members of younger order with membership of not over 9,000 and property of comparatively small value.

Error to Court of Civil Appeals of First Supreme Judicial District.

Suit by D. W. Michaux and others, as officers of the Arabia Temple of the Ancient Arabic Order of Nobles of the Mystic Shrine for North America, against A. H. Burrell and others, as officers and members of the Doric Temple of the Ancient Egyptian Arabic Order of Nobles of the Mystic Shrine of North and South America and its Jurisdictions, in which the national organizations of the respective shrines intervened. Judgment against defendants was affirmed by the Court of Civil Appeals (273 S. W. 874), and they bring error. Judgments affirmed.

Findings of fact (in part):

"V. On the 26th day of September, A. D. 1872, in the city of New York, and state of New York, Walter M. Fleming, and others, organized a voluntary, fraternal order, which they named 'Ancient Arabic Order of The Nobles of the Mystic Shrine,' which name was afterwards changed to 'Ancient Arabic Order, Nobles of the Mystic Shrine for North America,' under which last name it is now in existence and has been for many years; that the order has since the 26th day of September, 1872, been the same in all respects except the change of name as here indicated; that said order was organized by Masons of the Ancient and Accepted Scottish Rite of the Thirty-Second Degree or higher, or of Masons who were Knights Templar; that the subordinate bodies of said order were designated as temples, the first organized of which was Gotham Temple, the name of which has since been changed to Mecca Temple, which now exists as such temple and has since its origin so existed, located in the city of New York, and state of New York; thereafter in 1873 the members of said order with the permission of the original organizers created Gennessee Temple No. 2, which said last temple has been continuously in existence and is now in existence under the name of Damascus Temple; that said order has continuously existed and been in active and progressive operation since the 26th day of September, 1872, since which time it has organized throughout North America and within the islands under its jurisdiction 156 temples, each and all of which are under its jurisdiction and have a membership of approximately 600,000; that said order, and each and all of its subordinate temples, have been continuously active and in existence throughout North America and the islands under its jurisdiction continuously since the 26th day of September, 1872, being actively engaged in fraternal and charitable work and the accumulation of property for such purposes during all of said time, amounting to the sum of hundreds of thousands of dollars."

"X. That at the organization of said order it adopted a certain constitution and laws, and adopted as its emblem the crescent of silver, gold or coral, with a band of gold and a ring at its base and center, hung arch downward, the gold band to be decorated with a Sphinx Head on one side, a Pyramid with the Urn on the other, the original jewel or emblem being formed of two nails from a tiger's paw, united at their bases with a gold band, which said constitution and laws and said emblems, etc., were adopted for said Imperial Council immediately after its formation as the constitution, laws, and emblems of said order, together with the following emblems and jewels, to wit: Crescent, Pyramid, Sphinx Head, Pantherbodied Female Sphinx, the Urn, Sun, Moon, and Stars. The Red Turkish Fez was adopted as the universal style of head covering for the members of the order, the Crescent when worn as a pin or jewel is frequently combined with a scimitar between its points, which is worn generally by the members of said order; the constitution and laws with immaterial amendments, and the said jewels and emblems, and head covering have been strictly adhered to by said order and by said Imperial Council and by the temples and the members thereof since the organization thereof, and said order was the first order or organization or corporation in North America or elsewhere to adopt and use said constitution, laws, emblems and jewels; that said order at its organization, and the Imperial Council, immediately after its formation, adopted for said order certain distinctive insignia and paraphernalia, and said order and said Imperial Council, the temples, and members thereof strictly adhered to same since the original organization of said order; and said order was the first in North America or elsewhere to adopt and use said distinctive insignia and paraphernalia, etc.

"XI. That said insignia, paraphernalia, jewels and emblems, and head covering, constitution and laws have always been distinctive of said 'Ancient Arabic Order, Nobles of the Mystic Shrine for North America.'

"XII. That said order at its organization and said Imperial Council immediately after its organization adopted certain titles of officers of said Imperial Council and of its subordinate temples, as follows: For its Imperial Council: Imperial Potentate; Imperial Deputy Potentate; Imperial Chief Rabban; Imperial Assistant Chief Rabban; Imperial High Priest and Prophet; Imperial Treasurer; Imperial Recorder; Imperial Oriental Guide; Imperial First Ceremonial Master; Imperial Second Ceremonial Master; Imperial Marshal; Imperial Captain of the Guards; Imperial Outer Guard. And for its subordinate temples, the following, viz.: Illustrious Potentate; Chief Rabban; Assistant Rabban; High Priest and Prophet; Oriental Guide; Treasurer; Recorder; First Ceremonial Master; Second Ceremonial Master; Director; Marshal; Captain of the Guard; Outer Guard. That the distinctive name in popular parlance of said order has since its organization and continuously since been 'the Shrine,' and the distinctive name of the members of said order has continuously since its organization been popularly known as 'Shriners or Nobles.'

"XIII. That said order, 'Ancient Arabic Order, Nobles of the Mystic Shrine for North America,' and its predecessors in name, through continuous activities since the original organization thereof on September 26, 1872, was the first order, either corporate or otherwise, to adopt and use said name and the distinctive

286 S.W.—12

words therein in the name of a fraternal order throughout North America and the islands under the jurisdiction of the Imperial Council of said order, and the first in time to adopt and use the distinctive constitution and laws, and the distinctive emblems, insignia, regalia, paraphernalia, badges, head coverings, etc., and the first in time to adopt and use the distinctive names of officers of its Imperial Council, and of its subordinate temples, and the first in time to adopt and use the distinctive name of 'Temple' for its subordinate organizations, and the first in time to adopt and use the popular name of 'Shrine' for its subordinate organizations, and the first in time to adopt and use the popular name 'Shriners' and 'Nobles' for its members in North America and the islands under the jurisdiction of its Imperial Council, and have continuously since the original organization thereof adopted and used such distinctive constitution and laws, emblems, insignia, paraphernalia, regalia, jewels, badges, names of officers, names of subordinate temples, and names of members throughout North America and the islands under the jurisdiction of its Imperial Council; that no such order ever existed in Egypt, Arabia, or in any other European country.

"XIV. The continued existence of said order and of its Imperial Council, and of its subordinate temples, and the continued integrity of its membership depended entirely upon the good will and esteem in which they are held by the general public, as well as by the Masonic bodies from which the membership is drawn, and they depend for support upon initiation fees and dues paid by members, and any use of said constitution and laws, or distinctive names, or distinctive emblems, insignia, regalia, paraphernalia, jewels, badges, head covering, names of officers, titles of officers, names of subordinate temples, and names of members by any other fraternal organization, corporate or otherwise, is a continuing wrong and injury to said order and the membership thereof, and will cause irreparable damage and detriment. to said order, both in popular esteem, and in the continued existence thereof and in the growth thereof, and in the fraternal and charitable work in which it is engaged, as well as irreparable damage to its properties, for relief against which no adequate remedy at law exists.

"XV. On the 1st day of June, 1893, one Rofelt Pasha, purporting to be of Mecca, Arabia, initiated at Chicago, Ill., into an order which he designated as the 'Order of Mystic Shrine' certain, colored Masons, and designated said order as 'Imperial Grand Council of the Ancient Arabic Order, Nobles of the Mystic Shrine of Free Masonry of North and South America'; that said Rofelt Pasha, and his successors, including the defendants, and the defendant-intervener herein, appropriated unto themselves a constitution and laws, the insignia, paraphernalia, emblems, jewels, pins, head covering, titles of officers, names of subordinate organizations, and popular names of subordinate organizations, and names of members, which had theretofore been used and adopted and had become distinctive of the plaintiffs and plaintiff-intervener, and the other plaintiff-interveners herein, for more than 20 years; and thereafter several subordinate temples of said order withdrew from said organization and in December, 1900, organized at Philadelphia, Pa., the defend-

ant-intervener, under the name of 'Ancient Egyptian Arabic Order, Nobles of the Mystic Shrine for North and South America and its jurisdictions,' which last-named order was incorporated under the Revised Statutes of the United States, and has continuously existed, and has continued since said original organization and since such incorporation to appropriate the constitution and laws, titles of officers, insignia, regalia, paraphernalia, jewels, emblems, pins, names of subordinate organizations, names of members, and popular names of subordinate organizations and members of the plaintiffs, and of the plaintiff-intervener, and of the other plaintiff-interveners herein; that said organization is a colorable organization of the order of plaintiff, of plaintiff-intervener, and of the other plaintiff-interveners herein; and the names of its officers, of its Imperial Council, and of its subordinate temples, and the distinctive name of its subordinate organizations as temples, and its emblems, jewels, pins, head covering, regalia, paraphernalia, constitution and laws, and the popular names of its subordinate organizations, and of its members, are but colorable imitations of such of plaintiff, and of plaintiff-intervener and all other plaintiff-interveners herein, all of which having been appropriated by said defendant, and said defendant-intervener without the knowledge, consent or acquiescence of plaintiffs, or plaintiff-intervener, or other plaintiff-interveners herein; that said defendant and said defendant-intervener and its subordinate organizations have continuously since its organization, and continue now, to appropriate said constitution and laws, said titles of officers, said emblems, jewels, pins, paraphernalia, regalia, head covering, names of subordinate organizations, and names of members to the continuing injury and damage of plaintiff, plaintiffs, plaintiff-intervener, and other plaintiff-interveners herein for relief against which there is no adequate remedy at law.

"XVI. That notwithstanding the existence of defendant and defendant-intervener for more than 30 years, the entire membership of defendant-intervener throughout North America is approximately of not more than 9,000 and the property which it has accumulated comparatively small in value to that of plaintiff, plaintiffs, plaintiff-intervener, and that of other plaintiff-interveners herein.

"XVII. That neither plaintiffs, nor plaintiff-intervener, nor the other plaintiff-interveners herein, have acquiesced in, given permission to, or been guilty of laches in not instituting proceedings against said defendant, defendants, and said defendant-intervener.

"XVIII. That the continued use by the defendants and the defendant-intervener, and its subordinate temples and members, of the constitution and laws, titles of officers, insignia, emblems, badges, pins, paraphernalia, head covering, names of subordinate organizations, and names of members of the plaintiffs, and plaintiff-intervener, and other plaintiff-interveners herein, are colorable imitations thereof, constitute, and would continuously constitute a fraud and a fraudulent deception, unfair practice, and harmful injury to the plaintiffs, the plaintiff-intervener, the other plaintiff-interveners, and the entire membership of their order to their irreparable damage.

"XIX. That there is no evidence that the

said Rofelt Pasha was from Arabia, or was a native of Arabia, or an officer in any temple in the country of Arabia, or that he had any jurisdiction or authority to organize any fraternal order known as the 'Mystic Shrine in the United States,' and the court finds as a fact that he was not from Arabia, was not a native of Arabia, was not an official or representative of any Mystic Shrine Temple in Arabia, and that no Mystic Shrine Temple at that time, or before, or since, ever existed in Arabia."

"XXII. That the defendant-intervener and its various subordinate temples are in collusion and in confederation to continue their infringement of the rights of plaintiff, plaintiff-intervener, and the other plaintiff-interveners herein, and of their subordinate temples and membership."

Wilford H. Smith and W. M. C. Dickson, both of Houston, and Denison, Watkins & White, of Chicago, Ill., for plaintiffs in error.

Pollard, Fisher & Gaines and Jno. H. Crooker, all of Houston, for defendants in error.

### Opinion.

SPEER, J. Certain officers of the Arabia Temple of the Ancient Arabic Order of Nobles of the Mystic Shrine for North America filed in the district court of Harris county their application for an injunction against the officers and members of Doric Temple of the Ancient Egyptian Arabic Order of Nobles of the Mystic Shrine of North and South America and its jurisdictions to restrain the defendants from using the by-laws, regalia, paraphernalia, emblems, pins, and passwords of the complainants. The complainants constituted the local organization of the white shrine, whereas the defendants constituted the local organization of the negro shrine. Later, the national organizations of the respective shrines were allowed to intervene in the proceeding. There was a trial before the court, who filed very complete findings of fact (set out in the margin so far as pertinent to the issue discussed), upon which he rendered judgment against the colored shrine according to the prayer of complainants' petition, and upon appeal by the defendants the Court of Civil Appeals for the First District affirmed that judgment. 273 S. W. 874.

The Supreme Court, in view of the opinion of Chief Justice White in the case of Creswill v. Grand Lodge Knights of Pythias of Georgia, 225 U. S. 246, 32 S. Ct. 822, 56 L. Ed. 1074, granted the writ of error herein to review the decision.

[1] The findings of fact by the trial court which have been approved by the Court of Civil Appeals are conclusive upon us and are entirely sufficient to support the judgments of both courts, unless it can be said there is no evidence to support the finding that defendants in error were not guilty of such laches as to preclude their right to injunctive relief. We have no difficulty in holding that all findings of fact other than this one are amply supported by the evidence; that is, there is abundant evidence upon each issue as a matter of law to authorize such finding. We shall therefore confine ourselves to a consideration of the findings upon the issue of laches. In doing this, we will endeavor, of course, to respect the exclusive right of the lower courts to determine finally as to the existence of pure facts, but will consider the subject only for the purpose of determining what legal result will follow the facts as found.

[2-4] In order to fully appreciate the decision in Creswill v. Grand Lodge, it is well to consider the underlying reason for refusing a plaintiff relief by injunction, where such relief is denied upon the ground of laches. Of course, it is most elementary that, injunction itself being an equitable proceeding, a plaintiff must come into court with clean hands and, moreover, in having his relief, he must not himself do an injustice under all the circumstances. Logically, laches alone of the complainant constitutes no obstacle whatever as an equitable reason for denying injunctive relief against a continuous wrong. Laches may be of such duration, and the circumstances may be of such character, as to evidence assent or acquiescence upon the part of the plaintiff in the things complained of, and for that reason preclude relief. But this is not because of any equity in favor of the defendant, it is rather for want of equity with the complainant. This is no new doctrine; authorities perhaps from every state in the Union can be cited in support of it. We will content ourselves with referring to some of the decisions, which show this to be the rule in the United States Supreme Court.

In McLean v. Fleming, 96 U. S. 245, 24 L. Ed. 828, it is said:

"Equity courts will not, in general, refuse an injunction on account of delay in seeking relief, where the proof of infringement is clear, even though the delay may be such as to preclude the party from any right to an account for past profits."

And in Menendez v. Holt, 128 U. S. 514, 9 S. Ct. 143, 32 L. Ed. 526, Chief Justice Fuller for the court said:

"Counsel in conclusion earnestly contends that whatever rights appellees may have had were lost by laches; and the desire is intimated that we should reconsider McLean v. Fleming, 96 U. S. 245 [24 L. Ed. 828] so far as it was therein stated that even though a complainant were guilty of such delay in seeking relief upon infringement as to preclude him from obtaining an account of gains and profits, yet, if he were otherwise so entitled, an injunction against future infringement might properly be awarded. We see no reason to modify this general proposition, and we do not find in the facts as disclosed by the record before us anything to justify us in treating this case as an exception.

"The intentional use of another's trade-mark is a fraud; and when the excuse is 'that the owner permitted such use, that excuse is disposed of by affirmative action to put a stop to it. Persistence then in the use is not innocent; and the wrong is a continuing one, demanding restraint by judicial interposition when properly invoked. Mere delay or acquiescence cannot defeat the remedy by injunction in support of the legal right, unless it has been continued so long and under such circumstances as to defeat the right itself. Hence, upon an application to stay waste, relief will not be refused on the ground that, as the defendant had been allowed to cut down half of the trees upon the complainant's land, he had acquired, by that negligence, the right to cut down the remainder, Attorney General v. Eastlake, 11 Hare, 205; nor will the issue of an injunction against the infringement of a trade-mark be denied on the ground that mere procrastination in seeking redress for depredations had deprived the true proprietor of his legal right. Fullwood v. Fullwood, 9 Ch. D. 176. Acquiescence to avail must be such as to create a new right in the defendant. Rodgers v. Nowill, 3 DeG. M. & G. 614. Where consent by the owner to the use of his trade-mark by another is to be inferred from his knowledge and silence merely, 'It lasts no longer than the silence from which it springs; it is, in reality, no more than a revocable license.' "

And in McIntire v. Pryor, 173 U. S. 38, 19 S. Ct. 352, 43 L. Ed. 606, the following language of a prior decision is quoted with approval:

"The question of laches does not depend, as does the statute of limitation, upon the fact that a certain definite time has elapsed since the cause of action accrued, but whether, under all the circumstances of the particular case, plaintiff is chargeable with a want of due diligence in failing to institute proceedings before he did."

So, in Saxlehner v. Eisnor & Mendelson Co., 179 U. S. 19, 21 S. Ct. 7, 45 L. Ed. 60, a very luminous discussion of the subject, it is said:

"But in cases of actual fraud, as we have repeatedly held, notably in the recent case of McIntire v. Pryor, 173 U. S. 38, 19 S. Ct. 352, 43 L. Ed. 606, the principle of laches has but an imperfect application, and delay even greater than that permitted by the statute of limitations is not fatal to plaintiff's claim. We have only to refer to the cases analyzed in that opinion for this distinguishing principle that, where actual fraud is proved the court will look with much indulgence upon the circumstances tending to excuse the plaintiff from a prompt assertion of his rights. Indeed, in a case of an active and continuing fraud like this, we should be satisfied with no evidence of laches that did not amount to proof of assent or acquiescence."

The court took occasion to again approve the cases of McLean v. Fleming and Menendez v. Holt, supra.

[5] The important part that laches plays in preventing injunctive relief is found in its consideration along with other circumstances, produced usually, if not by, at least in some measure through, the inactivity of the complainant. As, for instances, the building up of a valuable business, the incurring of liabilities, or the interposition of important property rights. Logically, there can never be any equity in favor of a defendant entitling him to continue the perpetration of a wrong upon no other excuse than that the plaintiff had hitherto not complained. The underlying reason that controls in such matters is, and should be: Would the granting of an injunction under all the circumstances of the particular case be *inequitable?*

[6] In Menendez v. Holt, supra, holding as we have shown that mere delay will not prevent injunctive relief, the court was particular to point out:

"There is nothing here in the nature of an estoppel, nothing which renders it *inequitable* [italics ours] to arrest at this stage any further invasion of complainants' rights."

And in Creswill v. Grand Lodge, we take it to be the very gist of the decision is embraced in the following:

"The facts, however, which we have stated concerning the establishment of the order, its lodgment in Georgia, its vast expansion, its years of duration and its volume of transactions were not disputed in any particular whatever, and therefore leave no room for any other but the legal conclusion of laches. This, we think, in the most conclusive way demonstrates the violation of the elementary principles of equity which would result from the enforcement of the injunction which the court awarded."

The court says the principle applied is that of a legal conclusion of laches, but clearly it means laches, accompanied by circumstances which render an injunction inequitable. Laches is merely one of the elements entering into the consideration. The answering equity which precludes relief is the "new right in defendant," referred to by Chief Justice Fuller in Menendez v. Holt. In no other way is the decision to be harmonized with the other well-considered cases of that court above noticed, and it is to be observed that that court had no thought of holding contrarywise to any of those cases. Indeed, it cites with approval the Saxlehner v. Eisner Case. There is no shadow of turning in the Supreme Court decisions upon this question.

When the delay is for such time as under all the circumstances to show assent or acquiescence on the part of the plaintiff, to be sure equity will not interfere. Indeed, such assent or acquiescence, irrespective of time, would preclude relief.

[7, 8] In determining whether under all the circumstances the equities are with the complainant or with the defendant, it will not be required that all the equities should be one way or the other. There should be a

balancing of the respective rights and hardships of the parties, and a careful consideration of the relative inconveniences or injuries which the parties will sustain by the granting or refusal of the application for an injunction. In recognition of this principle, it has often been held that where the issuance of an injunction will cause great injury to defendant and will confer little or no benefit in comparison upon complainant, the writ will be refused, and, conversely, where a wrong against complainant is clear, and his injuries great, the writ will issue, notwithstanding it will produce some hardship upon the defendant. Nevertheless, it is also clear that where there is a violation of a plain right of the complainant and his injury is regarded as irreparable, he is ordinarily entitled to an injunction, even though the injury is relatively small as compared with the injury which the defendant will suffer as a result of the issuance of the writ. 32 C. J. p. 78, § 64.

[9, 10] It will be seen that most of the Supreme Court cases above discussed are tradename or trade-mark cases. In the Creswill v. Grand Lodge K. of P. Case the court assumed that the rules applicable to trademark and trade-name cases were likewise applicable to the question here being considered. We are of the opinion the rules should apply to this character of case with even greater force than in the trade-mark cases. The reason is plain. In the trade-mark and trade-name and unfair competition cases, the only injury to be suffered by the complainant is, in the nature of things, a commercial loss, the pecuniary value of which is easy of ascertainment. An important element of the injury in a case like this, if not the greatest element, is an injury in respect to a matter not of ordinary pecuniary value, capable of easy ascertainment, but one of first consideration to the complainants, and of incalculable worth as ordinary men account values. We refer to the right of the complainants to maintain their order with that degree of exclusiveness as will limit its membership, not only to Masons of high standing, but to white persons only. It cannot be denied that one of the chief values, and one of the strongly attractive features, of complainants' order consists in the fact that none but white males are entitled to its benefits. In thus restricting the rights of membership, the order has violated no legal right of any person excluded. It is not a question of ethics or moral or religious rights, or even of race discrimination. Nor yet is there any question of equal protection of law involved. The principle is precisely the same as though a society was organized limiting its membership by high tests of learning, skill, or the like. Clearly, the right to maintain such high standards of membership, followed by the consequent honors incident thereto, would be a valuable right capable of protection through the courts. That segregation of the white and black races is not only not unlawful, but may be lawfully enforced, is well settled. Witness the legislation of numerous states authorizing separate schools and other institutions, separate coaches, and the like. Witness further, even, statutes in many of the states, if not most of them, forbidding the intermarriage of blacks and whites. These laws are not in derogation of the fundamental rights of either race, but are in express recognition of the popular and esteemed value of segregation in social matters. No one will deny that defendant in error shrine, as a charitable and fraternal order, which contemplated membership by white persons only, will be materially affected if negroes are permitted to wear the identical emblems and insignia of such order, and when they do so from a fraudulent purpose of appropriating the benefits of the order to themselves, a court of equity is not without power to prevent them. The rule would be the same if the facts were reversed and the negroes were complaining.

This is not denying the plaintiffs in error the right to organize any social or fraternal order they may like, at any time they choose, so long as they do not wrongfully appropriate any of those things previously made valuable by the exclusive use of defendants in error. The courts will not hinder discovery, inventions, philanthropy, culture, or any other laudable human endeavor. But equity frowns upon unfair methods. The world applauds one who accomplishes a worth-while thing, but despises a faker. So with a court of equity within its sphere.

[11] Again reverting to Creswill v. Grand Lodge, and by way of making clear the controlling feature of that case, we quote from the opinion the uncontradicted facts:

" * * * The membership of the order [the defendant colored lodge] throughout the United States aggregated 300,000; that there had been collected and disbursed to the members of the order between July 1, 1906, and July 1, 1907, more than $500,000; that the collections in Georgia during the existence of the order there aggregated $180,232.21; that there had been paid to the widows and orphans of deceased members in Georgia $148,680, and that the collections in Georgia aggregated $51,000 a year, excluding the expense of burying their dead which was $9,000 more. * * * "

It is evident, then, the decision turned upon the conclusion that, in view of the facts stated, it would be inequitable to permit the injunction. In the present case no such state of facts exists. The established facts are that the order of the defendants in error has continuously existed and been in active and progressive operation since September, 1872, during which time it has organized throughout North America and within the

islands under its jurisdiction 156 temples, each and all of which are under its jurisdiction and have a membership of approximately 600,000; that said order and each and all of its temples have been continuously active and in existence throughout North America and the islands under its jurisdiction since said date, and been actively engaged in fraternal and charitable work and the accumulation of property for such purposes during all of said time, amounting to hundreds of thousands of dollars; that notwithstanding the existence of plaintiffs in error for more than 30 years, the entire membership throughout North America is approximately of not more than 9,000, and the property which it has accumulated is comparatively small in value to that of defendants in error. These facts being conclusively established, there is no such case as that of Creswill v. Grand Lodge K. of P., where the equities of the defendant were such as to make plaintiff's laches an insuperable objection to injunctive relief. The cases are to be contrasted—not compared. Here there is not that "new right in the defendants," that "vast expansion" of the order, that "volume of transactions" of business, held by the Supreme Court to estop the complainants, or to render inequitable the enforcement of an injunction.

Very little can be added to the well-considered opinion of the Court of Civil Appeals. We think its conclusions are sound upon every question discussed, and that the judgment is wise and in no respect contrary to the holding of our Supreme Court in Creswill v. Grand Lodge K. of P.

We therefore recommend that the judgments of the trial court and of the Court of Civil Appeals be in all respects affirmed.

CURETON, C. J. The judgment recommended in the report of the Commission of Appeals is adopted, and will be entered as the judgment of the Supreme Court.