# ANCIENT EGYPTIAN ARABIC ORDER OF NOBLES OF THE MYSTIC SHRINE ET AL. *v.* MICHAUX ET AL.

No. 7.   Argued January 12, 13, 1928.—Decided June 3, 1929.

*Mr. Harold S. Davis,* with whom *Mr. Moorfield Storey* was on the brief, for petitioners.

*Mr. Claude Pollard,* with whom *Messrs. D. A. Simmons* and *John H. Crooker* were on the brief, for respondents.

MR. JUSTICE VAN DEVANTER delivered the opinion of the Court.

This case presents a controversy between two fraternal orders called Nobles of the Mystic Shrine, one having white and the other negro members. A short reference to the origin and history of these orders will conduce to an accurate appreciation of the controversy.

From early times there have been two distinct masonic fraternities in the United States, one confined to white men and the other to negroes. Each has had its local lodges, grand lodges and supreme lodge, and also several component bodies, including Knights Templar and Scottish Rite consistories. Both have existed in the same territory and have had similar names, rituals and emblems, and yet have been independent and without any inter-

relation. The white fraternity's existence in this country reaches back to early colonial times. The negro fraternity was organized in Boston in 1784 and afterwards was extended to other sections.

The orders called Nobles of the Mystic Shrine are relatively modern, originated in the United States and are outgrowths of the masonic fraternities just described. They were founded by masons and their membership is restricted to masons—white in one case and negro in the other—who have become Knights Templar or have received the 32d degree in a Scottish Rite consistory. The white masons were the first to establish an order of Nobles of the Mystic Shrine. They organized one in New York in 1872 for fraternal and charitable purposes. The order grew rapidly and soon came to have local lodges, called temples, in most of the States, and also to have a national governing body called its Imperial Council. The negro masons imitatively organized a like order for like purposes in Chicago in 1893. It also grew, although not so rapidly as the white order, and came to have many local temples in other sections of the country and to have a national governing body called its Imperial Council. The constitution, emblems and regalia of the negro order, as also the titles given to the officers of its temples and council, were all adopted in imitation of those of the white order. Another feature imitatively copied was a purely fanciful claim, once put forth by the white order and afterwards discredited, to the effect that that order was an authorized extension of an ancient and illustrious order established centuries ago in Mohammedan countries.

Each of the orders, after becoming well organized, made it a practice to hold periodic national meetings attended with public parades and other features tending to bring attention to the order and to advance its extension. And, aside from such activities, each publicly engaged in commendable charitable work. The white order, by reason

of its greater membership and the larger resources of its members, was able to carry that work further than the negro order could, but the contributions and efforts of the latter in that field were both helpful and substantial.

The white order always has been a voluntary unincorporated association. In 1895 the New York legislature passed a special act purporting to incorporate it, but the proffered incorporation was rejected. In 1893 the negro order was incorporated under the laws of Illinois, but that incorporation was abandoned; and in 1901 the order was incorporated as a fraternal and charitable association under the Act of Congress of May 5, 1870, providing for the creation of corporations in the District of Columbia, c. 80, § 3, 16 Stat. 98, 101.

The name adopted by the white order is "Ancient Arabic Order of the Nobles of the Mystic Shrine for North America" and that adopted by the negro order, and under which it was incorporated, is "Ancient Egyptian Arabic Order of the Nobles of the Mystic Shrine of North and South America and its Jurisdictions."

Prior to 1918 both orders established local temples in the State of Texas—in some instances in the same cities. Among the temples of the white order were one in Dallas established in 1887, one in El Paso established in 1907 and one in Houston established in 1915. Among those of the negro order were one in Dallas established in 1894, one in El Paso established in 1902 and one in Houston established in 1917.

The present suit was begun in 1918 in a state court of Texas. Originally it was brought by members of the local temple of the white order in Houston against members of the local temple of the negro order in that city to enjoin the latter from using any imitation of the name, constitution, titles, emblems and regalia of the former. But through the voluntary intervention of other parties and a voluntary enlargement of the original pleadings—all

with the court's leave—the suit was broadened into one between the two national orders wherein the white order sought an injunction against the negro order restraining and preventing the latter, its lodges, officers and members, "throughout the State of Texas and the entire United States," from further using the name under which it was acting, from designating its local lodges as "temples," from designating its members as "Nobles" or "Shriners," from giving the officers of its lodges and council the titles of like officers in the white order, from using a constitution, emblems and regalia like those of the white order and from organizing or instituting lodges in imitation of those of that order.

The answer of the negro order may be summarized as denying that the white order had acquired any exclusive or superior right to use the name, constitution, designations, titles, emblems and regalia before mentioned or any of them; denying that the negro order's use of such name, constitution, designations, titles, emblems and regalia was with any wrongful or fraudulent purpose, or was other than the exercise of a right belonging to that order as a lawfully constituted fraternal and charitable association; setting up the negro order's incorporation in 1901 under the Act of Congress of May 5, 1870, and asserting that in virtue of that act and such incorporation the order became entitled, if not theretofore entitled, to use the name which it had been and was still using, to adopt and have a constitution, to establish and have local lodges, to select and use appropriate emblems and regalia, and to do other things properly incident to the maintenance of a fraternal and charitable order; alleging that its acts and practices were all within its rights under that incorporation; asserting that there had been and was no competition between the two orders and that the white order drew its members wholly from the white masonic fraternity while the negro order drew its members wholly from the

negro masonic fraternity; and setting up that the white order by reason of its laches and its acquiescence in the acts and practices of the negro order was without right to an injunction or other equitable relief.

On a trial of the issues the court made special findings of fact, stated its conclusions of law and entered a decree awarding to the white order all of the relief sought. The findings of fact included one to the effect that the imitative acts and practices of the negro order constituted " a fraudulent deception " injurious to the white order; and another to the effect that the white order had not acquiesced in those acts and practices and was not chargeable with laches in not taking earlier steps to stop them. The conclusions of law and the decree are copied in the margin.[1] The decree was affirmed by the Court of Civil Ap-

---

[1] CONCLUSIONS OF LAW.

I.

The plaintiffs, and the plaintiff-intervenor, and the other plaintiff-intervenors herein being first in time to use and adopt the constitution and laws, the regalia, paraphernalia, jewels, badges, head covering, titles of officers, names of subordinate organizations, and names of members in North America or elsewhere, and having used same continuously for more than fifty (50) years are entitled to an injunction restraining the use thereof by the defendants, and the defendant-intervenor, and this regardless of whether plaintiff intervenor is incorporated or exists, and has existed, as a voluntary unincorporated, fraternal, benevolent or social organization.

II.

The plaintiff, plaintiff-intervenor, and the other plaintiff-intervenors herein having established their legal right to the injunction, and the injury which will accrue to them if an injunction is denied being a continuous injury and wrong, the injunction may issue notwithstanding the facts may disclose delays in seeking relief.

III.

The intentional use by the defendants and defendant-intervenor of the constitution and laws, titles of officers, regalia, paraphernalia, jewels, emblems, badges, pins, head covering, names of subordinate

peals, 273 S. W. 874, and by the Supreme Court of the State, 286 S. W. 176. The negro order then petitioned this Court for a review upon writ of certiorari and the petition was granted.

organizations, and names of plaintiff, plaintiff-intervenor, and the other plaintiff-intervenors herein by a literal appropriation thereof is a fraud, being used as a fraud as against plaintiffs, plaintiff-intervenor, and the other plaintiff-intervenors herein, and constitutes a continuing wrong, demanding a judicial interposition by the issuance of an injunction and mere delay or even acquiescence cannot defeat the remedy, unless such delay has been continued so long and under such circumstances as to defeat the right itself, and the facts in this case do not show such delay, or laches, as would constitute a defense to the issuance of the injunction herein.

## IV.

The plaintiff, the plaintiff-intervenor, and the other plaintiff-intervenors herein have not been guilty of such laches or delay, or acquiescence as to defeat their right to the issuance of the injunction.

## DECREE.

Wherefore it is ordered, adjudged and decreed by the Court that the individual defendants and each of them, and the defendant, "Doric Temple [Houston] of the Ancient Egyptian Arabic Order of the Nobles of the Mystic Shrine of North and South America and its Jurisdictions" and the officers and membership thereof; and the defendant intervenor, "Ancient Egyptian Arabic Order Nobles of the Mystic Shrine of North and South America and its Jurisdictions" and each and all of its officers and members and their associates, confederates and successors in office; and each and all of the "Temples" thereof, and their officers and membership throughout North America be perpetually restrained and enjoined from:

## I.

Using the name "Ancient Egyptian Arabic Order Nobles of the Mystic Shrine of North and South America and its Jurisdictions" or any other name, the distinctive words of which are a colorable imitation of the name "Ancient Arabic Order of the Nobles of the Mystic Shrine for North America" and from using any of the distinctive words in said name and particularly the distinctive words "Ancient Arabic" and the distinctive word "Nobles" and the distinctive words "Mystic Shrine" or any colorable imitation of

In the state appellate courts the negro order relied on the Act of Congress of May 5, 1870, and its incorporation thereunder, just as it had done in the trial court, and also insisted that the decree against it was not in accord with the decision of this Court in *Creswill* v. *Knights of Pythias*, 225 U. S. 246, where like privileges asserted under that act of Congress by a fraternal and benevolent association incorporated thereunder were involved.

The right' thus specially set up in the state court is a federal right. Whether it was denied or not given due recognition by the challenged decree, as affirmed, is a question on which the defeated claimants are entitled to

---

either of them, as the name or part of the name of any society or organization, corporate or otherwise.

## II.

From using the name "Temple" or any colorable imitation thereof as the designation of any organization either governing or subordinate, of any society or organization, corporate or otherwise.

## III.

From organizing, undertaking to organize or maintaining directly or indirectly, or in any manner encouraging the organization or maintenance any where throughout the North America, or [of] any governing body under the name of "Imperial Council" or any colorable imitation thereof; or any subordinate body under the name of "Temple" or any colorable imitation thereof; or under the name of "Shrine" or any colorable imitation thereof as the name of, or. for, any society or organization, corporate or otherwise.

## IV.

From using, wearing or displaying as insignia or emblems of' membership of any society or organization, corporate or otherwise, any of the emblems, insignia, paraphernalia, badges, jewels or head-covering, etc., or any colorable imitation thereof, of the plaintiffs or plaintiff intervenor or plaintiffs intervenors or any of its Temples or subordinate organizations.

## V.

From using as a part of any organization, corporate or otherwise, or in connection therewith the Constitution and By-laws of the plain-

invoke the judgment of this Court, as is done in their petition for certiorari. And it is our province to inquire not only whether the right was denied in direct terms, but also whether it was denied in substance and effect by interposing a non-federal ground of decision having no fair support. *Creswill* v. *Knights of Pythias*, 225 U. S. 246, 258, 261; *Ward* v. *Love County*, 253 U. S. 17, 22; *Davis* v. *Wechsler*, 263 U. S. 22, 24; *Railroad Commission* v. *Eastern Texas R. R. Co.*, 264 U. S. 79, 86; *New York Central R. R. Co.* v. *New York & Pennsylvania Company*, 271 U. S. 124, 126.

The record and the opinions set forth therein make it apparent that the existence within the State of Texas of local lodges of each of the two orders was not contrary to any statute of the State. The state court put its decision upon principles of general law which it deemed appli-

---

tiffs and the plaintiff intervenor and plaintiffs intervenors, and their Temples and subordinate organizations or any colorable imitation of the same or of any part thereof.

### VI.

From using, wearing or displaying any of the emblems, insignia, paraphernalia, jewels, badges, head-coverings, constitution and laws, titles of officers or colorable imitation thereof of the plaintiffs or plaintiff intervenor or the other plaintiffs intervenors herein, as the emblems, insignia, paraphernalia, jewels, badges, head-covering, constitution and laws and titles of officers of any fraternal or secret order, or other organization or society by whatever name it may be called, and whether corporate or otherwise.

### VII.

From using the name "Shrine" as the name of any fraternal or secret order or other organization or society by whatever name it may be called or otherwise known and whether corporate or otherwise.

### VIII.

From using the name "Shriner" and the name "Nobles" as a designation of the membership of any fraternal or secret order or other organization or society, by whatsoever name it may be called or known and whether corporate or otherwise.

cable, and not upon any local regulations. It did not wholly refuse to recognize the right set up by the negro order in virtue of the incorporation under the act of Congress, but did hold that the white order had acquired a superior and exclusive right to use the name, constitution, emblems and regalia in question by prior adoption and use; that the subsequent adoption and use by the negro order was in derogation of that right; that the white order, in the absence of acquiescence or laches on its part, was entitled to an injunction preventing further use by the negro order; and that there had been no such acquiescence or laches as would constitute a bar to that relief, inasmuch as the negro order had been proceeding with "a fraudulent purpose of appropriating the benefits of the [white] order to themselves."

Whether the rules relating to the use of trade-marks and trade-names are applicable to controversies like this between fraternal orders has been the subject of varying decisions in other courts. Without now indicating any opinion on that question, we shall indulge the assumption that the state court was right in holding those rules applicable and shall pass to another matter turning on the facts of this case, and which as resolved by the state court resulted in the denial of the federal right set up by the negro order. That matter is whether there was acquiescence or laches on the part of the white order. The state court held there was neither. If there was either, the white order was without any right to object to the use which it was seeking to restrain and the negro order was entitled to continue that use in virtue of its incorporation under the Act of Congress.

An attentive examination of the record discloses not only that the finding on the question of laches is without fair support in the evidence, but that the evidence conclusively refutes it.

There is no evidence of a fraudulent intent on the part of the negro order, or of a purpose on its part to induce any one, whether mason or non-mason, to believe that it was the white order or that they were parts of the same fraternity. On the contrary, it is shown that the negro order always held itself out as entirely distinct from the white order and as open only to members of the negro masonic fraternity. True, there was much imitation, but this is shown to have been in the nature of emulation rather than false pretense.

The evidence discloses that the negro order promptly entered its constitution in the Congressional Library under an act of Congress providing for copyrights; that its members openly wore its insignia as indicative of its existence and their membership; and that at its yearly national meetings the members in large numbers marched in public parades wearing its regalia.

It is further shown that the Imperial Potentate of the white order in his address at their national meeting in 1894 called attention to the existence of the negro order and to its use of names, titles, etc., like those of the white order. He also named Texas as one of the States in which the negro order had established lodges. The address was published and distributed among the lodges and members of the white order. At several subsequent meetings there was a similar mention of the negro order and its activities.

Thus it is established that from the beginning the white order had knowledge of the existence and imitative acts and practices of the negro order. In addition, the evidence indubitably shows that with such knowledge the white order silently stood by for many years while the negro order was continuing its imitative acts and practices and was establishing new lodges, enlarging its membership, acquiring real property in its corporate name, and investing substantial sums in the copied paraphernalia, regalia

and emblems. It also is shown by the uncontradicted testimony of several witnesses—one a life member of the white order—that a large proportion of the copied paraphernalia, regalia, emblems and insignia used by the negro order, its lodges and members was purchased from or through members of the white order, and that in one instance a lodge of that order, preparatory to moving to new quarters, sold the paraphernalia and regalia used in the old quarters to a lodge of the negro order in the same city.

The effect on the negro order of the silence and apparent acquiescence of the white order is reflected in the fact that when this suit was brought the former had 76 local lodges, approximately 9,000 members and real and personal property valued at approximately $600,000 which was held and used for fraternal and charitable purposes.

The only evidence making against that already outlined consists of a showing that a suit was instituted in Georgia in 1914 by a local lodge of the white order against a local lodge of the negro order to restrain the latter from imitating the name, emblems and regalia of the former and that a similar suit was begun in Arkansas a few years later—one resulting in a decree for the plaintiffs and the other in a decree for the defendants. In instituting these suits the plaintiff lodges undoubtedly manifested strong objections to the imitative acts of the defendant lodges. But the objections came too late to overcome or weaken the force of the conduct of the white order during the 30 years preceding the earlier of the two suits. After that period of inaction and seeming acquiescence it was too late to resuscitate the original exclusive right for which the white order is now contending. *Saxlehner* v. *Eisner & Mendelson Co.,* 179 U. S. 5, 19, 37.

What we have said of the evidence demonstrates, as we think, not only that there was obvious and long continued

laches on the part of the white order, but also that the circumstances were such that its laches barred it from asserting an exclusive right, or seeking equitable relief, as against the negro order. *Creswill* v. *Knights of Pythias,* 225 U. S. 246, 261–263; *Saxlehner* v. *Eisner & Mendelson Co.,* 179 U. S. 19, 35–37; *Piatt* v. *Vattier,* 9 Pet. 405, 416; *Hayward* v. *National Bank,* 96 U. S. 611, 617; *French Republic* v. *Saratoga Vichy Co.,* 191 U. S. 427, 436–437; *Benedict* v. *City of New York,* 250 U. S. 321, 328; *Du Boulay* v. *Du Boulay,* L. R. 2 P. C. 430, 446.

As it is apparent that had this view of the question of laches prevailed in the state court, the federal right set up by the negro order must have been sustained, the decree must be reversed and the cause remanded for further proceedings not inconsistent with this opinion.

*Decree reversed.*