THE GRAND TEMPLE AND TABERNACLE IN STATE OF TEXAS OF KNIGHTS AND DAUGHTERS OF TABOR OF THE INTERNATIONAL ORDER OF TWELVE et al. v. INDEPENDENT ORDER OF KNIGHTS AND DAUGHTERS OF TABOR OF AMERICA et al.

No. 1269—5788.

Commission of Appeals of Texas, Section B.

Jan. 6, 1932.

J. H. T. Bibb, W. T. Caven, and Lane & Lane, all of Marshall, for plaintiffs in error.

Davidson, Blalock & Blalock, of Marshall, for defendants in error.

RYAN, J.

"The Grand Temple and Tabernacle in the State of Texas of the Knights and Daughters of Tabor of the International Order of Twelve," a corporation incorporated under the laws of the state of Texas, J. S. Adair, "Chief Grand Mentor," and H. L. Smith, "Chief Grand Scribe," thereof, filed this suit in the district court of Marion county against "The Independent Order of the Knights and Daughters of Tabor of America," a corporation also incorporated under the laws of the state of Texas, S. S. Reid, "Independent Chief Grand Mentor," C. H. M. Furlow, "Independent Chief Grand Scribe," Carnation Tabernacle No. 14, a subordinate branch of said "Independent Order," Annie Jackson, "Independent High Priestess," and Norma Brooks, "Independent Chief Recorder," of said subordinate, for injunction restraining the defendants and all persons acting in subordination or in conjunction with them from using the name "Independent Knights and Daughters of Tabor of America," the names or similar names of the subordinate temples and tabernacles, emblems, insignia, paraphernalia, badges, titles of grand and subordinate officers, by-laws, and constitution in colorable imitation, similar or like those of plaintiff order, and for judgment against the defendant order and S. S. Reid for actual damages in the sum of $10,000.

It was alleged that plaintiff was on June 20, 1895, incorporated under the laws of the state of Texas, as a charitable corporation, and has, ever since, engaged in fraternal and charitable work, and as a feature of its operation it issues to its members, in consideration of the payment of assessments and dues, a certificate entitling the beneficiary of such member, upon his death, to participate in an endowment fund, confined to certain named classes as specified in its by-laws; that during its existence it has had many thousands of members to join its organization, and has accumulated many thousands of dollars worth of real and personal property, including "cash

money;" that it has adopted and used for more than thirty-two years certain titles for its officers, such as chief grand mentor, grand high priestess, vice grand mentor, vice grand priestess, chief grand scribe, chief grand recorder, chief grand treasurer, grand queen mother, chief grand orator, chief grand priestess, grand inner sentinel, grand auditor, and for those of its subordinate temples the following titles, viz.: Chief mentor, vice mentor, chief scribe, assistant scribe; chief treasurer, chief orator, chief drill master, chief color bearer, three chief guards and a chief sentinel, and for its subordinate tabernacles the following titles, viz.: High priestess, vice priestess, chief recorder, vice recorder, chief treasurer, chief priestess, inner sentinel, outer sentinel, tribunes (3), board of examiners (3), board of visitors (3).

It was further alleged that there have been organized throughout its jurisdiction in Texas as many as nine hundred such subordinate temples and tabernacles with a membership of more than thirty-five thousand, and that it has in all respects complied with the law governing fraternal insurance, and is legally authorized to issue the certificates above named to its members; that it has adopted certain distinctive insignia, paraphernalia, emblems, and rules of procedure, which have been strictly adhered to since its formation, and was the first organization in the state of Texas to adopt and use the same, as well as the titles of its officers and those of its temples and tabernacles; "that the distinctive name in popular parlance has, since its organization and continuously thereafter, been known as The Knights and Daughters of Tabor." It was further alleged that the defendant S. S. Reid was one of the organizers of plaintiff order, and shortly after its organization and incorporation was elected its chief grand scribe, and continuously occupied such position until the 27th day of June, 1924, when, at the annual grand session of plaintiff order held in the city of Austin, Tex., he withdrew his membership; that immediately after such withdrawal he began, with the assistance of certain associates, the organization of what defendants designate as a fraternal benefit society similar in many respects and features to plaintiff order, and on the 17th day of October, 1924, the said S. S. Reid, together with J. R. Beavers and others, filed with the secretary of state of the state of Texas certain articles of incorporation, which, among other things, provided that the name of said corporation should be "The Independent Order of the Knights and Daughters of Tabor of America"; that, immediately after the incorporation of said defendant order by the said S. S. Reid and his associates, they adopted certain by-laws and constitution, and by the terms thereof the names and titles of the officers of the grand temple and tabernacle were designated and adopted as follows: Independent chief grand mentor, inde-

pendent grand high priestess, independent vice grand mentor, independent vice grand high priestess, independent chief grand scribe, independent chief grand recorder, independent chief grand treasurer, independent chief grand orator, independent chief grand queen mother, independent chief grand priestess, independent chief grand inner sentinel, independent chief grand outer sentinel, editor independent victory, independent grand presiding prince, independent grand lecturer; that by the terms of said by-laws the titles of officers of the subordinate temples and tabernacles were designated and adopted as follows: Independent chief mentor or independent high priestess, independent vice mentor or independent vice high priestess, independent chief scribe or independent chief recorder, independent assistant scribe or independent assistant recorder, independent chief treasurer, independent chief orator or independent chief priestess, independent chief drill master or independent chief sentinel, independent chief color bearer or independent outer sentinel, independent chief guards or independent board of examiner, independent chief guard or independent board of visitors, independent chief sentinel or independent tribunes; that by the terms of said by-laws and constitution of said defendant order the governing body thereof was designated as the "State Grand Independent Temple and Tabernacle"; that the subordinate bodies which defendant order reserved the right to create were by said by-laws designated as independent temples and tabernacles, and that the Independent Grand Temple and Tabernacle should have full authority to grant charters for the organization of said subordinate temples and tabernacles in the state of Texas; that, since the incorporation and organization of said defendant order, it has granted to sundry temples and tabernacles charters or permits to operate, with identical names as those of plaintiff order; that the by-laws and constitution and the titles for the officers of the grand and subordinate temples and tabernacles so adopted by defendant order are in many respects identical, or similar to the titles of the officers of the grand and subordinate temples and tabernacles and by-laws and constitution of plaintiff order; that said by-laws and constitution and the titles of the officers of the grand and subordinate temples and tabernacles of defendant order are in many respects identical, and are a colorable imitation of the by-laws and constitution of plaintiff order, as well as the titles of the officers of its grand and subordinate temples and tabernacles.

It was further alleged that the purpose of said Reid and his associates in incorporating the defendant order with a name, constitution, and by-laws, and titles for its officers and those of its subordinate organizations so similar to those of plaintiff order, was to

confuse and mislead the public and the members of plaintiff order, as a result of which many of plaintiff's members were caused to withdraw their membership into defendant order. It was further charged that the defendant Reid and his associates were guilty of fraud and the practice of deception in procuring the incorporation of defendant order in and under the name "Independent Knights and Daughters of Tabor of America," because said corporate name so closely resembles the said name of plaintiff order as to mislead the public or lead to confusion, and is contrary to the laws of the state of Texas; that defendant order is issuing beneficiary certificates, and is operating under the popular and distinctive name "Knights and Daughters of Tabor"; that it is operating in violation of the laws of the state of Texas, and has failed and refused to comply with the statutory provisions authorizing the doing of an insurance business and the issuance of such certificates as are so issued, and among the many charters or permits issued by defendant order to subordinate temples and tabernacles is one to Carnation Tabernacle No. 14, located in Marion county, of which the defendant Annie Jackson is high priestess and defendant Norma Brooks is chief recorder, and such tabernacle and its officers are operating under and controlled by the by-laws of defendant order, similar to those of plaintiff order, and are using the same titles as those of plaintiff order.

Defendants' answer consisted of general and special exceptions, general denial, and special pleas, in effect, that defendants Reid and Furlow were formerly members of plaintiff order, but, because of an unlawful conspiracy in which plaintiffs Adair and Smith participated, a fraudulently conducted election of officers was had, resulting in a "split or division" of the original organization, and therefore the defendants do not stand in the same relation to the plaintiff order that a new organization would stand, which had been formed and "copied or covered the ritual and nomenclature of another organization."

It was further alleged "that the members of the defendant order are in truth and in fact Knights of Tabor and Daughters of Tabor, because their ritual and teachings are based upon the lessons to be drawn from the Biblical account of the Battle between the Children of Israel and the King of Canaan, at Mount Tabor. That the principles taught therein are the principles taught by the original organization. That the laws of this state do not grant to any individual organization or corporation the exclusive right to appropriate the teachings of the Holy Bible. That the plaintiffs herein departed from and abandoned the principles aforesaid in the operation of the organization, and substituted therefor trickery, fraud, and chicanery, and that it became necessary for the members thereof who desired to continue said teachings to withdraw and set up another vehicle for the continuation and perpetuation of the Taborian ideals. For this particular reason, among others, the defendant order and its officers have made every honest effort to distinguish between the plaintiff order and defendant order in the public mind. That, although the printed teachings of the two organizations may be somewhat alike, nevertheless, the defendant order is an entirely separate and distinct organization and has so held itself out to the public," and "the defendant order was incorporated under the laws of the State of Texas, and charter granted by the Secretary of State of the State of Texas, on the 17th day of October, 1924; that since that date it has been operating in the State of Texas under the same name, with the same titles for its officers, with the same emblems and insignia, and the same rules of conduct under which it is now operating, and of which the plaintiffs complain in their petition; the plaintiffs well knew of the incorporation of the defendant order at the time of its incorporation. They knew the name it had adopted, they knew the titles of its officers, they knew of its general laws, of its emblems, insignia, and other uses of which they now complain, and have known of same continuously since the date of the organization of the defendant order. During the said time the defendant order has vigorously pushed its organization, and has solicited members and new chapters, independent temples and independent tabernacles, in the manner in which it is now doing, and 4000 negro people have joined the defendant order, and are grouped throughout the State of Texas in approximately 130 local organizations. To each of these members a death benefit certificate has been issued, entitling each of said members, or their heirs, or legal dependents, to certain funds with which to give the deceased member a decent burial, and with which to give temporary succor to the dependent ones left by said deceased member; each of these certificates represents a thing of value, and its value rests and depends upon, an active membership in the defendant order, and the payment of the dues by the members thereof. To seriously cripple, to hamper or destroy the defendant order would be to destroy all of these rights owned and enjoyed by its respective members."

It was further alleged that "plaintiffs have stood by throughout the years, permitting the defendant order to organize, grow, develop, as it has, and they are at this late date for the first time complaining to the courts of the land of the things set out in their petition, and in this the plaintiffs are guilty of laches, and are estopped. To grant the relief which they seek at this late date would be inequitable as between the parties hereto."

It was further averred that "the defendants admit that, as alleged by the plaintiffs, the defendant, S. S. Reid, was formerly for many years an officer of high standing in the plaintiff order; that in truth and in fact he inspired the organization of the plaintiff order in the State of Texas, and was its most ardent advocate until the time of his resignation in 1924; and withdrew his membership from the old organization, which he had inspired and nurtured and loved, and organized an independent order, which is the defendant herein, in order that he and his friends and followers might continue, to foster the principles and ideals which they loved to teach, through an organization honestly controlled and managed."

The facts disclosed by the record are:

Both corporations are fraternal insurance organizations incorporated on the dates and as alleged in the original petition, and operate exclusively among negroes, through subordinate organizations known as "temples" (composed of men) and "tabernacles" (composed of women), and issue certificates entitling members to certain death benefits.

The plaintiff order has a proper permit from, and is under the supervision of, the insurance department; such permit for the year 1929 was issued by R. B. Cousins, Jr., chairman of the board of insurance commissioners, addressed to "The Knights and Daughters of Tabor" at Waco, Tex. The defendant order has never placed itself under the supervision of the insurance department. Reid, its chief officer, testified, "We got permission from the Secretary of State to organize and we were not put under the Commissioner of Insurance, and therefore we could take in members as we pleased," and Furlow, its grand Scribe, testified "our organization has never qualified to do insurance business and does not carry a permit from the Commissioner of Insurance; we have no one to investigate our books to determine whether we are solvent or insolvent."

The name of plaintiffs' Grand Lodge is "Grand Temple and Tabernacle" and of defendants' Grand Lodge is "Independent Grand Temple and Tabernacle of Texas," the chief officer of plaintiff order in Texas is "Chief Grand Mentor," and of defendant order is "Independent Chief Grand Mentor," and in the subordinate branches, "Chief Mentor," "High Priestess," and "Independent Chief Mentor," "Independent High Priestess," and so on, the word "Independent" prefixing each name in the defendant order; otherwise the titles are the same.

Prior to 1924, when defendant order was organized, there was no order or organization, other than plaintiff order, doing business among the negro race in Texas using as its name or part of its name the words "Knights and Daughters of Tabor," and that was its distinctive name.

The old or plaintiff order has continuously operated in this state since about 1888, during which time the words "Knights and Daughters of Tabor" have been a part of its name, and these words were carried into and used in the name of the new or defendant order. The plaintiff order is commonly known among the members and public generally as "Knights and Daughters of Tabor."

Since the organization of the new order, confusion has resulted in mail delivery. Letters from the insurance department with reference to unpaid claims against the new order, also letters from parties purporting to hold such claims, have been addressed and delivered to the chief grand scribe of the old order, at Waco; citation in writs against the new order have been served on him, and attorneys in different parts of the state who represented beneficiaries of deceased members of the new order, on various and sundry occasions, addressed their communications to "Knights and Daughters of Tabor, Waco, Texas," and these were delivered to the plaintiff order by the postal authorities. In one instance it was alleged that the defendant order, sued in Bowie county, is also known as "Independent Order of 12 Knights and Daughters of Tabor, that they are one and the same organization, and that service upon one is service upon both and that the principal office of defendant is Waco, McLennan County, Texas, where service may be had."

After refusing plaintiffs' request for a peremptory instruction, the trial court submitted to a jury two special issues, viz.:

(1) "Do you find from a preponderance of the evidence that the name adopted and used by the defendant was so similar to the name adopted and used by the plaintiff as that the use of the name adopted by the defendant under all the facts and circumstances in evidence would naturally and probably mislead and confuse the public to believe that the defendant order is the plaintiff order?"

(2) "Do you find from a preponderance of the evidence that such fact, if any, has resulted in injury to plaintiff or is calculated to result in injury to plaintiff?"

Both were answered in the negative, and upon that verdict judgment was rendered for the defendants, and the relief sought by plaintiffs was denied.

The honorable Court of Civil Appeals at Texarkana reached the conclusion that "as a matter of pure law, there is dissimilarity in the names of the two organizations," and affirmed the judgment below. 28 S.W.(2d) 212, 214.

### Opinion.

A corporation cannot lawfully adopt either the same name as that of an existing

corporation created by or under the laws of the state, or of an unincorporated association or partnership therein, or a name so similar to that of an existing corporation or association that its use is calculated to deceive the public and result in confusion or unfair and fraudulent competition (14 C. J. p. 312), and may be enjoined from such use, whatever may be the character of the corporations, and whether or not they are formed for profit, to the same extent and upon the same principles that individuals are protected in. the use of trade-marks and trade-names (14 C. J. p. 326). And there can be no distinction in principle between taking the entire name of the prior corporation and taking so much of it as will mislead into the belief that the two concerns .are the same. The mischief is of precisely the same character, differing only in degree. Similarity, and not identity, is the usual recourse where one corporation seeks to benefit itself by the name of another. 7 R. C. L. p. 134.

The above doctrine was followed in Burrell v. Michaux (Tex. Civ. App.) 273 S. W. 874, affirmed by the Commission of Appeals, same case, 286 S. W. 176. It is true that writ of certiorari was granted by the Supreme Court of the United States, and the judgment of the state courts was reversed, but only upon the finding that the plaintiff was guilty of obvious and long-continued laches, under circumstances which barred it from asserting an exclusive right, or seeking equitable relief as against the defendant. Ancient Egyptian Order v. Michaux, 279 U. S. 737, 49 S. Ct. 485, 73 L. Ed. 931. In that case it was established that the plaintiff order, known as Nobles of the Mystic Shrine, composed exclusively of white members, had knowledge from the beginning of the existence and imitative acts and practices of the defendant negro order, and with such knowledge silently stood by for more than twenty years, while the negro order was continuing its imitative acts and practices, establishing new lodges, enlarging its membership, acquiring real property in its corporate name, and investing large sums in the copied paraphernalia, regalia, and emblems. It was further shown that a large proportion of the copied paraphernalia, regalia, and emblems used by the negro order, its lodges and members, was purchased from or through members of the white order, and in one instance a lodge of that order, preparatory to moving to new quarters, sold its equipment, used in the old quarters, to a lodge of the negro order in the same city.

In the instant case, the original petition was filed on August 16, 1927; the defendant's charter is dated October 17, 1924; and it began doing business in November of that year.

A proposal to change defendant's name to "Independent Order of K. and D. of America" was offered and adopted at a meeting of its grand lodge held in July, 1927, and a committee with plenary powers in the premises was chosen, but this committee had not acted, nor has a meeting of the grand lodge been had between July, 1927, to the time of trial of this cause in the district court, and the defendant order is still transacting business under the old name.

Furlow, independent grand scribe of the defendant organization, a member of the committee, testified "the reason why we did not make the change after the committee was authorized to act, was because we decided that we were really Knights and Daughters and some attorneys told us we could go ahead and use that name."

■ If the plaintiff order was guilty of laches in not seeking injunctive relief between November, 1924, and July, 1927—which we are not prepared to accede to—this certainly was condoned by the defendants' grand lodge in directing a change of name. Under the circumstances, we have concluded that plaintiff order was not guilty of laches in seeking injunctive relief. The defendants' grand lodge decided to change its name in July, 1927, selected a committee to effectuate such change, and, when the committee refused to do so, the suit was filed within the following month. The case does not come within the rule of .laches announced by the Supreme Court of the United States in Ancient Egyptian Order v. Michaux, supra.

From the uncontroverted evidence above detailed it is manifest that the similarity in names did result in confusion, and tended to and did deceive the public and public officials.

It is true that the jury found that the name adopted and used by the defendant order was not so similar to the name adopted and used by the plaintiff order as would naturally and probably mislead and confuse the public, and that no injury has resulted, or is calculated to result, to plaintiff order, but these findings are in the face of, and contrary to, the uncontroverted evidence. As said by Judge Leddy in Vogel v. Allen, 118 Tex. 196, 13 S.W. (2d) 340, 341, "it is a general rule that the court is not authorized to render a judgment notwithstanding the findings of the jury. * * * There is, however, a well-recognized exception to this rule to the effect that where, under no view of the pleadings and evidence, the plaintiff is entitled to recover, the submission of the issues and the findings of the jury are immaterial, and may be disregarded by the court."

■ The Supreme Court will not disturb findings of fact, the truth of which depend upon the preponderance of evidence, but will consider all the evidence to determine, as a question of law, its sufficiency to support such findings of fact. Gainesville Water Co. v. City of Gainesville, 103 Tex. 394, 128 S. W. 370.

In Grand Fraternity v. Melton, 102 Tex. 399, 117 S. W. 788, the court held that, where the evidence establishes a fact to a moral certainty, it is error to submit the issue to the jury as a doubtful one; in such case the trial judge should direct a verdict. In that case, the evidence, having clearly established the fact that insured voluntarily shot himself, precluded the submission to the jury of the issue as to whether his act was intentional, justified a peremptory instruction to find against the beneficiary of his insurance policy, and required the Supreme Court to reverse and render for the defendant insurer a judgment in favor of the beneficiary, although supported by a finding of the jury that the act was not intentional, which the trial and civil appellate courts had refused to set aside.

Here, a peremptory instruction was requested by plaintiff order, and should have been granted by the trial court.

There was no evidence of any amount of damages or value of losses of dues and therefore no recovery therefor can be had against defendant order or S. S. Reid.

We recommend that the judgments of the district court and Court of Civil Appeals be reversed and here rendered in favor of plaintiffs in error, granting the relief prayed for by them, except as to recovery of damages against said Reid, in which respect the judgments below be affirmed.

CURETON, C. J.

Judgments of the Court of Civil Appeals and the district court reversed, and judgment rendered in favor of plaintiffs in error, as recommended by the Commission of Appeals.