

# THE ATTORNEY GENERAL
## OF TEXAS

GERALD C. MANN
~~JOHN BEN SHEPPERD~~
~~ATTORNEY GENERAL~~

AUSTIN 11, TEXAS

Honorable Will Mann Richardson
Assistant Secretary of State
Austin, Texas

Dear Sir:                    Opinion No. O-4173
                             Re:  Corporations -- similarity of
                                  names.

        Your request for opinion has been received and care-
fully considered by this department.  We quote from your re-
quest as follows:

        "We have an application for a charter for
    a corporation wishing to use the name 'Safe-Way
    Auto Loan Plan, Inc., of Houston'.  The charter
    application is in the proper form and is accom-
    panied by the written consent of a corporation
    operating in Dallas, using the name 'Safe-Way
    Auto Loan Plan, Inc.,'.  We have had a protest
    filed by another Texas corporation to our grant-
    ing of the charter on the grounds that the name
    would conflict with the name 'Safeway Stores,
    Inc.,'.

        "There are only two corporations in Texas
    at the present time using the name 'Safe Way'.
    You will note that one of them has consented to
    the new corporation's use of the name and the
    other corporation is objecting to it.  It is the
    contention of Safeway Stores, Inc., that even
    though they do a grocery business and even though
    they are not doing business in Houston at the
    present time they still have the right to protest
    our granting the charter to a corporation using
    a similar name.

        "We would appreciate an opinion from your
    department as to whether the fact that a company
    is not operating in a certain locality should be
    sufficient  to render a similar name available for
    corporate use in that locality.

        "Counsel for both parties have indicated
    their desire to submit a brief on the question

and the briefs will be forwarded to you for your
consideration in determining this point."

"Supplementing our letter of December 8th
we wish to state that Safeway Stores Inc., of
Texas was incorporated on January 18, 1916, and
that Safeway Auto Loan Plan Inc., was incorporated
on June 19, 1941. The former company has a capi-
tal stock of $100,000.00, whereas the Loan Com-
pany has a capital stock of $2,000.00.

"When the charter for the loan company was
granted the grocery corporation was not notified
but immediately after the charter was granted the
grocery corporation protested any further charter
using that name.

"Attorneys for the Safeway Stores Inc., of
Texas have submitted a brief on the subject which
is attached to this letter for your convenience."

We have also carefully considered the briefs submitted by the
applicant for charter and by Safeway Stores, Inc., of Texas.

The applicant for charter, states in its brief, after
citing authorities:

"We respectfully submit that under the facts
in the particular controversy the foregoing au-
thorities compel a ruling by your Department that
the Secretary of State should grant the requested
charter. Certainly is this true when it is real-
ized that the corporations involved are doing
business in different cities and a different line
of business, and with a proposed corporate name
substantially and materially different from the
existing objecting corporation."

Safeway Stores, Inc., of Texas, states in its brief,
after citing authorities:

"Already Safeway operates more than 160
stores in Texas, stores from El Paso to Texarkana
and from Denison South to Austin. New stores go
into operation each year in new counties. In the
normal operation and expansion of Safeway's busi-
ness it will develop that small area of South Texas,
not now served by Safeway.

"It is a matter of common knowledge that Safe-

way Stores, Inc. of Texas has spent many thousands of dollars all over the State in advertising to build up and put its name before the public. And that through many years of merchandising high grade products has built up an enviable reputation so that its trade name 'Safeway' is a valuable ensigna and symbol of its reputation and good-will. Through its conduct and through its advertising it has built a well established mercantile reputation and its trade name is of considerable value to it. Safeway operates in every section of the State and we do not feel that a corporation whether in the business of merchandising groceries or in any other type of business should be allowed to capitalize upon the well established mercantile reputation built up by Safeway Stores over many years of fair dealing and the expenditure of large sums of money for advertising."

The case of Board of Insurance Commissioners vs. National Aid Life (Austin Court of Civil Appeals) 73 S.W. (2nd) 671, writ of error refused by the Texas Supreme Court, holds:

"1. Trade-marks and trade-names and unfair competition

"Rule that equity will protect corporation in use of name applies where subsequent corporation attempts to use similar name to that of existing corporation.

"2. Trade-marks and trade-names and unfair competition

"In absence of statute, administrative agency granting charters, articles of incorporation, or permits to carry on business will not permit use by subsequent corporation of name similar to or so nearly like that of another as would be likely to produce confusion.

"3. Corporations

"Under statute authorizing refusal of permit to do business to domestic insurance corporation if name is so similar to existing corporation's as to be likely to mislead public, which provision subsequently was made condition upon which foreign insurance corporations should be permitted to do business, Board of Insurance Commissioners had power to refuse permit to foreign insurance cor-

poration where name similar to that of another
foreign corporation was likely to cause confusion
(Rev. St. 1925, arts. 4700, 5068).

"4.  Corporations

"Statute authorizing refusal of permit to
do business to insurance corporation with name
similar to 'any other insurance company' applied
where permit had already been issued to foreign
insurance corporation with similar name and which
was then engaged in business (Rev. St. 1925, arts.
4700, 5068).

"5.  Trade-marks and trade-names and unfair com-
     petition

"There is an unlawful appropriation where one
corporation appropriates and uses distinctive por-
tion of another corporation's name.

"6.  Corporations

"Name 'National Aid Life' held so similar to
name 'National Aid Life Association' as to justify
Board of Insurance Commissioners in refusing permit
to do business to the 'National Aid Life' on ground
that similarity of names would be likely to mislead
the public in that the distinctive portion of two
names was identical (Rev. St. 1925, arts. 4700,
5068).

"7.  Constitutional law

"Statute authorizing Board of Insurance Com-
missioners to refuse permit to do business to in-
surance corporation with name so similar to  that
of existing corporation as to be likely to mislead
public held not unconstitutional as delegation of
arbitrary power (Rev. St. 1925, arts. 4700, 5068)."

We quote from the Court's opinion in said case as fol-
lows:

"Article 4700 vests in the Board of Insurance
Commissioners, whose duty it is to issue permits
to both foreign and domestic life insurance corpora-
tions to carry on such business in this state, the
power to refuse a permit where the name of the sub-
sequent domestic corporation is 'so similar to that

of any other insurance company as to be likely to mislead the public'.  This statute merely adopts the universal rule that equity will protect a corporation in the use of a name selected and used by it, which rule likewise applies where a subsequent corporation attempts to use a similar name to that of an existing corporation.  Thompson on Corporations (3d Ed.) Vol. 1. pp. 85-87,  877; Holloway v. Memphis, etc. R. Co., 23 Tex. 465, 76 Am. Dec. 68.  The statutes of many states expressly adopt the rule, and it has been held, even where no such express statutory provision exists, the court, officer, or administrative or ministerial board whose duty it is to grant or refuse charters, or articles of incorporation, or certificates of authority, or permits to transact or carry on business within a state, will not permit the use by any subsequent corporation of a name similar to or so nearly like that of another corporation as would be likely to produce mistake or confusion.  Philadelphia Trust, etc., Co. v. Philadelphia Trust Co. (C.C.) 123 F. 534; Thompson on Corporations (3d Ed.) vol. 1, p. 80, and cases there cited.

"........

It may be remarked that since the statute against similarity of names has merely adopted the equity rule aforementioned, cases construing such rule necessarily control.

"......

"Nor did the Board abuse its discretion in concluding that the names of the two corporations involved were so similar as to likely mislead the public dealing with them.  The general rule is that 'there is an unlawful appropriation where one corporation appropriates and uses the distinctive portion of another corporation's name'.  .....

"It is clear that the distinctive portion of the names of the two corporations in the instant case is 'National Aid Life', and the mere omission of the word 'Association' by appellee to its name would not distinguish it from the other existing corporation.

"......

In the case of The Grand Temple, etc. vs. Independent Order, K. & D. of T., 44 S.W. (2nd) 973 (Texas Commission of Appeals), it was held that the name "Knights and Daughters of Tabor of the International Order of Twelve" and Independent Order of Knights and Daughters of Tabor of America", were similar as a matter of law, entitling the former corporation to injunctive relief against the latter. This case further holds that a corporation may be enjoined from using a name similar to that of another corporation or association, regardless of the character of the corporations. We quote from the Court's opinion in said cause as follows:

"A corporation cannot lawfully adopt either the same name as that of an existing corporation created by or under the laws of the state, or of an unincorporated association or partnership therein, or a name so similar to that of an existing corporation or association that its use is calculated to deceive the public and result in confusion or unfair and fraudulent competition (14 C.J. p. 312), and may be enjoined from such use, whatever may be the character of the corporations, and whether or not they are formed for profit, to the same extent and upon the same principles that individuals are protected in the use of trade-marks and trade-names (14 C.J. p. 326). And there can be no distinction in principle between taking the entire name of the prior corporation and taking so much of it as will mislead into the belief that the two concerns are the same. The mischief is of precisely the same character, differing only in degree. Similarity, and not identity, is the usual recourse where one corporation seeks to benefit itself by the name of another. 7 R.C.L. p. 134."

We quote from the case of Wall vs. Rolls-Royce of America, 4 F. (2nd) 333, as follows:

". . . that by reason of the high standard of its product and the volume and spread of its trade the name Rolls-Royce has become associated all over the world with the excellence of its product, and is associated in the public mind with high-grade work, and gives its owners an established, distinctive, and valuable business asset; . . . .

". . . . it is clear that the purpose of Wall was to take and use the good will, fair name, and

trade record which the two companies had, through years of business integrity, given to the name 'Rolls-Royce', and thereby create in the minds of the public the impression that his mail order tubes bore some connection with the real Rolls-Royce companies. Upon no other theory than a purposed appropriation to himself, and an intent to convey to the public a false impression of some supposed connection with the Rolls-Royce industries, can Wall's actions and advertisements be explained. Seeing, then, that by putting his individual business under the name 'Rolls-Royce', and utilizing its trade reputation and earned good will, Wall could greatly benefit himself, the converse of the proposition follows: That this veiling of his business under the name 'Rolls-Royce' might, and indeed almost surely would, injure the real Rolls-Royce industries, and substantially detract from their good will and fair name. It is true those companies made automobiles and aeroplanes, and Wall sold radio tubes, and no one could think, when he bought a radio tube, he was buying an automobile or an aeroplane. But that is not the test and gist of this case. Electricity is one of the vital elements in automobile and aeroplane construction, and, having built up a trade-name and fame in two articles of which electrical appliances were all important factors, what would more naturally come to the mind of a man with a radio tube in his receiving set, on which was the name 'Rolls-Royce', with nothing else to indicate its origin, than for him to suppose that the Rolls-Royce Company had extended its high grade of electric product to the new, electric-using radio art as well. And if this Rolls-Royce radio tube proved unsatisfactory, it would sow in his mind at once an undermining and distrust of the excellence of product which the words 'Rolls-Royce' had hitherto stood for.

"In addition to what has been said, it is quite possible that the use of such a name might lead third parties to credit the plaintiff's business, on account of its name of 'Rolls-Royce', with an unwarranted financial reliability, and if such assumptions eventually prove unfounded the name of 'Rolls-Royce' would suffer accordingly. Indeed, from the standpoint of commercial integrity, fair business, and trade equity, we feel the court below, sitting in equity, was justified in pre-

venting the defendant from veiling his business under the name of 'Rolls-Royce', for he had, and could have had, but one object in view, namely, to commercially use as his own a commercial asset that belonged to others, the continued use and abstraction of which is so fraught with such possibilities of irremediable injury that the only way to remedy it is to stop it at the start."

In the case of L. E. Waterman Co. vs. Gordon, 72 Fed. (2nd) 272, the owner of a trade name "Waterman" who manufactured fountain pens and pencils was allowed to enjoin the junior use of the same name by a corporation manufacturing electric razors.

In the case of Armour & Company vs. Master Tire and Rubber Company, 34 Fed. (2nd) 201, it was held that a meat packer was entitled to enjoin the defendant's use of the word "Armour" as a trade name in the business of manufacturing and selling tires. The Court held in this case that in a suit for injunction based on unfair competition in using a trade name, direct competition in plaintiff's field is not a necessary element. We quote from said case as follows:

".......... The Armour family, through various and successive representatives thereof, was continuously identified with the business, and through the successive years large sums of money were expended for the building up of the good will and reputation of the company's products. . . . .

"Defendants claim the selection of the word 'Armour' was for the purpose of signifying the tough, stable, and hardy character of the automobile tires; that is, that the product was in some unaccountable way 'armoured', and was calculated to in some way create the impression of strength. The reasonableness of this contention is not sufficiently persuasive to even require comment.

"The inescapable conclusion, drawn from the tenor of the entire record, is that the use of the word 'Armour' in the corporate name of the selling company, and as a brand and trade-name to the product, was selected for the purpose of taking advantage of the business reputation of the plaintiff company, the family name of the organizer, and of those prominently interested in that company throughout its existence, in the good will of that company gained by years of ingenious advertising and the expenditure of vast sums of money

therefor, and for the purpose of confusing the
public and leading defendant's patrons to believe
by the use of the word 'Armour'; that its product
was of a superior standard and quality, and to
induce other members of the public to become patrons
under such a belief. Fraud, or the attempt at
fraud, is discernible as the underlying and appeal-
in conclusion.

"        . . . . . . .

"And the court furthermore says:

"'With a practically unlimited field of dis-
tinctive names open to it for choice, when the de-
fendant lately entered the automobile industry,
the fact that it chose to take a name that had no
connection or association with the automobile trade,
except the good will and association which the plain-
tiff had given it, shows conclusively that the name
was given to this new venture in the automobile
field because of its established high regard in
that industry, which had been given it  by the
plaintiff.'

"        . . . . . ."

        In the case of Alfred Dunhill of London, Inc. vs.
Dunhill Shirt Shop, 3 F. S. 487, a corporation making pipes and
smoker's supplies was allowed to enjoin a corporation selling
shirts from using the same name.

        The case of Great Atlantic & Pacific Tea Co. vs. A. &
P. Radio Stores, 20 Fed. Supp. 703, held that the owner of a
nationally known and valuable trade-name could restrain third
party use of trade-name in connection with a noncompeting busi-
ness even though custom and trade was not divided by such use,
since the owner's reputation might be tarnished thereby. We
quote from said case as follows:

        "The plaintiff seeks to restrain the de-
fendant from using its trade-name 'A & P' in con-
nection with its business of selling radios, wash-
ing machines, and electric refrigerators. None
of these articles is sold by the plaintiff. Con-
sequently the first question presented is whether
the owner of a nationally known and valuable trade-
name may restrain its use by a third party in con-
nection with a noncompeting business. It is quite
clear that in such a case the defendant is not ac-

tually diverting custom and trade from the plain-
tiff. Such an injury, however, is not the only
one which may result. As was said by Mr. Justice
Shientag in Philadelphia Storage Battery Co. v.
Mindlin, 163 Misc. 52, 296 N.Y.S. 176, 178: 'The
normal potential expansion of the plaintiff's
business may be forestalled. * * * His reputation
may be tarnished by the use of his mark upon an
inferior product. * * * A false impression of a
trade connection between the parties may be created,
possibly subjecting the plaintiff to liability or
to the embarrassments of litigation, or causing
injury to his credit and financial standing.'

"The underlying principle involved in these
cases was well put by Circuit Judge Learned Hand
in Yale Electric Corporation v. Robertson (C.C.A.)
26 F. (2d) 972, 974, as follows: 'However, it has
of recent years been recognized that a merchant
may have a sufficient economic interest in the use
of his mark outside the field of his own exploita-
tion to justify interposition by a court. His
mark is his authentic seal; by it he vouches for
the goods which bear it; it carries his name for
good or ill. If another uses it, he borrows the
owner's reputation, whose quality no longer lies
within his own control. This is an injury, even
though the borrower does not tarnish it, or divert
any sales by its use; for a reputation, like a
face, is the symbol of its possessor and creator,
and another can use it only as a mask.'

"It is on the basis of this developing concep-
tion of unfair competition that the courts have
repeatedly restrained the use of similar trade-
marks on noncompeting goods. See Walter v. Ashton,
1902, 2 Ch. 282; Aunt Jemina Mills Co. v. Rigney
& Co. (C.C.A.) 247 F. 407, L.R.A. 1918C, 1039,
cert. den. 245 U.S. 672, 38 S. Ct. 222, 62 L. Ed.
540; Aluminum Cooking Utensil Co. v. Sargoy Bros.
& Co. (D.C.) 276 F. 447; Vogue Co. v. Thompson-
Hudson Co. (C.C.A.) 300 F. 509; Wall v. Rolls-
Royce of America (C.C.A.) 4 F. (2d) 333; Hudson
Motor Car Co. v. Hudson Tire Co. (D.C.) 21 F. (2d)
453; Duro Co. v. Duro Co. (C.C.A.) 27 F. (2d) 339;
Standard Oil Co. v. California Peach & Fig Growers
(D.C.) 28 F. (2d) 283; Del Monte Special Food Co.
v. California Packing Corporation (C.C.A.) 34 F.
(2d) 774; Waterman Co. v. Gordon (C.C.A.) 72 F. 272;
Alfred Dunhill of London v. Dunhill Shirt Shop

(D.C.) 3 F. Supp. 487; Great Atlantic & Pacific
Tea Co. v. A. & P. Cleaners & Dryers (D.C.) 10
F. Supp. 450.

". . . . . . ." (Underlining ours)

In the case of Sweet Sixteen Co. vs. Sweet "16" Shop,
15 Fed. (2nd) 920, the plaintiff in 1916 opened a dress shop
using the name "Sweet Sixteen" in San Francisco and by 1921 had
five stores in states touching the Pacific ocean. In 1923 the
defendant started a dress shop in Salt Lake City, Utah, using
the name "Sweet 16" despite the protest of plaintiff. The
evidence in this case also showed that Utah was the natural
sphere of expansion for plaintiff. The Court held that the
plaintiff was entitled to enjoin the defendant from using the
name "Sweet 16" even though the plaintiff did not have any
stores in Utah. We quote from said case as follows:

"'It may be suggested whether, in these days
of rapid and constant intercommunication and ex-
tended commerce between nations, any narrow line
of demarkation should be established, on the one
side of which should stand moral wrong with legal
liability, and upon the other moral wrong with
legal immunity. If, however, the courts of a par-
ticular government can, with respect to the subject
in hand, take cognizance only of wrongs committed
within the geographical boundaries of the country,
it is still not necessary, in our judgment, that
a trade in an article should be fully established,
in the sense that the article be widely known,
before the proprietor of its trade-mark or trade-
name may be entitled to the protection of equity
for the preservation of his rights. Otherwise it
might be impossible, with respect to a valuable
and desirable article or product of manufacture,
designated by a particular brand or in a particu-
lar manner, ever to establish a trade. Craft and
cunning, discerning the value of the product, and
the profit to be acquired, would, at the inception
of the business, flood the market with spurious
and cheaper articles or preparations of the simili-
tude of the genuine, and strangle the trade in the
genuine at its birth. It is enough, we think, if
the article with the adopted brand upon it is ac-
tually a vendible article in the market, with in-
tent by the proprietor to continue its production
and sale. It is not essential that its use has
been long continued, or that the article should
be widely known, or should have attained great

reputation.  The wrong done by piracy of the trade-
mark is the same in such case as in that of an
article of high and general reputation, and of
long-continued use.  The difference is but one
of degree, and in the quantum of injury.  A pro-
prietor is entitled to protection from the time
of commencing the user of the trade-mark.'"

We quote from the case of United Brotherhood, etc. vs.
Carpenters and Joiners, etc., 110 S.W. (2nd) 1209, as follows:

"We are impressed with the language of the
Court in Barton vs. Rex-Oil Company, C.C.A. 2 F.
(2nd) 402, 40 A.L.R. 424:  Why with all the words
of the English Language at its disposal (appellee
here) it should adhere to these particular words?"

The distinctive portion of the name of Safeway Stores,
Inc. of Texas is clearly "Safeway".  It is undoubtedly true, as
represented in the brief for Safeway Stores, Inc., that it has
expended large sums of money for advertising and now has built
up a splendid and honorable business reputation and that Houston
is undoubtedly within its normal sphere of business expansion.
On the other hand, applicant for charter, has never used the
name "Safeway", has never created any good will for or added any
lustre to the name "Safeway".  We pose this question: "Why it
is, with thousands of other words in the English Language at
applicant's disposal, it should determine on the use of the word
"Safe-way" (which is idems sonans with "Safeway") in its pro-
posed corporation?"

You are, therefore, respectfully advised that it is
the opinion of this department that your question should be
answered in the negative.  It is our further opinion that under
the facts related the Secretary of State in the exercise of his
discretion would be justified in refusing to allow the applicant
to use the name "Safe-way" in its charter.

Very truly yours

ATTORNEY GENERAL OF TEXAS

By s/Wm. J. Fanning
    Wm. J. Fanning
    Assistant

WJF:mp:wc

APPROVED JAN 23, 1942
s/Grover Sellers
FIRST ASSISTANT
ATTORNEY GENERAL

Approved Opinion Committee By s/BWB Chairman